## UNITED STATES v. ARROW STEVE-DORING CO.
### No. 11519.

United States Court of Appeals
Ninth Circuit.
June 21, 1949.

Rehearing Denied Aug. 9, 1949.

See also 175 F.2d 333.

Frank J. Hennessy, U.S. Atty., San Francisco, Cal., Leavenworth Colby and Keith R. Ferguson, Sp. Assts. to Atty. Gen., William E. Licking, Asst. U. S. Atty. San Francisco, Cal., for appellant.

John H. Black, Edw. R. Kay, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and BONE and ORR, Circuit Judges.

DENMAN, Chief Judge.

The government appeals from a decree in admiralty denying it recovery from Arrow Stevedoring Company, hereafter called Arrow, which the government impleaded in a proceeding brought against it by one Percy L. Williams, a stevedore employee of Arrow. The government sued Arrow upon Arrow's contract to indemnify the government against any loss suffered by it from Arrow's performance of its agreement to unload the steamer's cargo. It claimed Arrow's liability to the government for Arrow's failure to give Williams a safe place to work while unloading naval cargo from the U.S.S. Edgecomb, resulting in Williams' injury, for which the government became liable. Williams' injury arose from the negligent use of a defective hatch cover which fell on him.

The government admits liability to the stevedore because it had a continuing duty

to him to see that at all times he had a safe place to work, and is so liable to him for a failure to keep the vessel seaworthy in that regard. Such liability exists even though the sole proximate cause of such unseaworthiness and the injury to Williams was not the defect in the hatch cover but, as the government claims, its conscious use with knowledge of its defect, by the stevedore's superintendent in a way making it dangerous and causing the injury to Williams.

It is not questioned that though the unseaworthy condition arising from the negligent use of the hatch cover was not caused by the government's fault, it is nevertheless liable. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 90, 66 S.Ct. 872, 90 L.Ed. 1099.

Williams was injured just after 7 a. m. on May 28, 1945, by the falling of the cover of the No. 4 port hatch on the third and lower deck of the Edgecomb. The hatch cover was of steel, 14 feet long fore and aft and 8 feet wide athwartship, and weighed about 3500 pounds. When raised it was intended to be secured by dogs held by pins, one fore dog attached to the hatch bulkhead there and another aft attached to the hatch's after bulkhead. We agree with the district court's finding that both dogs were defective and their pins absent and could not hold erect the heavy hatch cover and that it fell on Williams because so insecurely held by the defective dogs.

However, we think that the court's finding that "none of the defects" in the dogs "were known to * * * respondent Arrow Stevedoring Company nor its agents, servants and employees" is clearly erroneous and that it was error to hold that Arrow's conduct was not a proximate cause of the injury to Williams.

Arrow's stevedore supervisor, Bowers, testified that on the night before the accident he was supervising the night shift's unloading of both the starboard and port No. 4 hatches. That the port hatch was raised and secured by the stevedores at about 2 o'clock of the morning of the accident to Williams which occurred shortly after 8 o'clock. The defect in the dogs of the port hatch cover was then discovered and the work discontinued at that hatch. His statement is repeated. One is:

"Q. Were you there at the time of the accident? A. No, but I knew what condition the hatch was in when I left.

"Q. When you rigged this gear you considered it safe, didn't you? A. No, I didn't.

"Q. You just so testified a moment ago. A. That is why we wouldn't work in there, because it was not safe."

The dogs were to be held to the cover by pins, and Bowers states:

"Q. Did you see a pin put in both hooks? A. They couldn't get one pin; they were trying for about fifteen minutes and they couldn't get one pin in because it was bent.

"Q. That was the forward pin? A. The forward pin.

"Q. That is the pin you were talking to Mr. Kay and I about out in the hall? A. We couldn't get the hook in.

"Q. You couldn't get that pin in?

"Q. There was no pin in the after dog? A. No, there was no pin in the after dog."

With the port hatch standing in this unsafe condition, Bowers' stevedores worked the opposite safe starboard hatch until six o'clock in the morning, when their shift ended. The morning stevedore shift began work at seven o'clock. Bowers testifies that he did not warn anyone on the morning shift of the dangerous condition of the port hatch.

At seven o'clock Larsen, Arrow's boss of the No. 4 hatch, from the top deck "looked down in the hatch and everything seemed safe to me." O'Shea was foreman of the day gang and his six men were sent into the port hatch to remove empty shells which were stored to within six inches of the top of the compartment below. The hatch cover started to fall, a warning was shouted three escaped and three men, including Williams, were caught under it, Williams being injured and another, Mitchell, was killed.

Bowers testified that on the afternoon before the accident he asked the lieutenant officer of the ship to rig a boom to lift the hatch on the port side. A part of the conversation is as follows:

"A. No, I would not take any cargo from the offshore side, at all.

"Q. The offshore side was the port side? A. Yes.

"Q. This officer told you that he would have the cover properly rigged *sometime* during the day? A. During the daytime.

"Q. During the day shift? A. Yes.

"Mr. Taheny [proctor for Arrow]: He has answered that three or four times.

"Mr. Licking [proctor for United States]: I have no further questions.

"Mr. Taheny: That is all.

"Mr. Kay: That is all.

"Mr. Licking: That is the Government's case, if your Honor please."

It is thus apparent that Arrow's supervisor knew that the ship would do nothing about the cover of port hatch No. 4 until "sometime" during the day shift. Assuming that this transferred to the ship, to perform sometime in the morning shift, the obligation of Arrow's contract, later considered, to raise this hatch door, Arrow clearly owed the duty to see that none of its stevedores should work under it until the danger known to exist was removed. Certainly the ship had no obligation to do more than it promised, that is to rig the door *sometime during* the day shift, not before the shift began to work.

The testimony is uncontradicted that in this defective condition of the dogs of the port hatch the cover could have been securely held erect by a clamp and turnbuckle attached to both starboard and port hatch doors. Such turnbuckle and gear was right there by the hatch for that purpose. Of this Arrow's day boss on the morning of the accident, Larsen, stated: "As a rule you secure the two tanktops together."

The evidence shows that the door was so safely secured by the clamp and turnbuckle during the day shift but, unhappily, after the injury and death of the men. We may assume that the ship's officers knew that the proper method of securing the hatch door was by the use of the turnbuckle gear it there supplied. Bowers testified that he had not advised anyone, particularly the lieutenant he talked with, that the hatch door had been raised. His testimony

in response to the questioning of Arrow's proctor Kay is:

"Q. Mr. Kay: Q. When you went to this lieutenant you wanted to find out about opening the hatches as well as rigging the gear, didn't you? A. Not about the hatches, no; I went to the lieutenant to rig the gear; it was nothing to do. with the hatches.

"Q. Did you talk to anybody about the hatches at any time? A. Just what do you refer to?

"Mr. Licking: You mean at any time of night or at any time?

"Mr. Kay: Q. Any time at all you were on this ship.

"The Court: Did you talk to anybody about the hatches? A. Not that I know of.

\*     \*     \*     \*     \*     \*

"Q. Were you there at the time of the accident? A. No, but I knew what condition the hatch was in when I left.

"Q. When you rigged this gear you considered it safe, didn't you? A. No, I didn't.

"Q. You just so testified a moment ago. A. That is why we wouldn't work in there, because it was not safe."

On the facts we find that the sole proximate cause of the injury to Williams was the negligence of Arrow in its use of the door with knowledge of its defects of dogs and pins. The government in no way participated in the wrongful use of the door, which otherwise could have been made secure in the usual manner described by Arrow's Larsen. Seaboard Stevedoring Corp. v. Sagadahoc S. S. Co., 9 Cir., 32 F.2d 886; Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co., 9 Cir., 10 F.2d 769, 771; The Mars, D.C., 9 F.2d 183, 184, Learned Hand, D. J.

Arrow's contract with the government provides for its liability to the government for such sole negligence in the following language:

"Article 26. Liability and Indemnity.
\*     \*     \*     \*     \*     \*

"(b) The Contractor shall be liable to the Government for any loss or damage

which may be sustained by the Government as a result of the negligence or wrongful acts or omissions of the Contractor's officers, agents or employees or through fault of its equipment or gear, subject, however, to the following limitations and conditions:
* * *

"(2) The Contractor shall not be responsible to the United States for any loss or damage resulting from any act, or omission of any employee of the Government, or resulting from compliance by officers, agents, or employees of the Contractor with specific directions of the Port Director, NTS, Twelfth Naval District, Nor shall the Contractor be so responsible for any such loss or damage resulting from default of ships or other gear supplied by the Government."

Arrow is liable to the government "as a result of the negligence of [its] * * * agents" and not "resulting from default of ships or other gear supplied by the Government."

We agree with Arrow's brief and the government's position that these contract provisions determine the relation of the parties in the instant situation. Here is no ambiguity as to liability such as arose in the case of American Stevedores, Inc. v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011. There both government and stevedore company were liable for the injury to the stevedore and under a similar contract there were conflicting interpretations stated 330 U.S. 446, at pages 457–458, 67 S.Ct. 847, 91 L.Ed. 1011 as to the government's right to contribution from its joint tort feasor. Here, with no participation of the government in the wrong done Williams by Arrow, Arrow's agreement to assume liability can have but one interpretation and that favorable to the government.

■ Arrow claims that even if the government is liable because of Arrow's fault in creating an unseaworthy place for Williams to work, Arrow is not liable to the government because the Longshoremen's and Harbor Workers' Compensation Act, under the heading "Exclusiveness of Liability," provides:

"The liability of an employer * * * shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death * * *." 33 U.S.C.A. § 905.

We do not agree. Here Arrow has contracted to be liable to the government for the latter's liability arising (here, solely,) from the former's negligence. We do not think that the phrase "and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death" takes from the employer the right to *contract* for such a liability, assuming that in the absence of such a contract the government is "anyone otherwise entitled," etc. We construe the act as limited to liability of the employer to those entitled to damages from the injury to or death of the employee, without any contract relationship to the employer other than the employment.

Arrow's construction leads to the absurdity that an employer could not make a contract with the employee in a dangerous occupation agreeing to pay him double the compensation of the Act. If an employer were prevented by the Longshoremen's Act from paying such additional compensation, it is apparent that in a small labor supply important enterprises and their production plants would lie idle.

The decree is reversed and the district court instructed to enter a decree in favor of the government for the amount of its liability to Williams, with interest for the breach of Arrow's agreement from the date of the reversed judgment and for its costs.