## UNITED STATES v. ARROW STEVE-DORING CO.

### No. 11880.

United States Court of Appeals
Ninth Circuit.
June 21, 1949.

Rehearing Denied Aug. 9, 1949.

Frank J. Hennessy, U. S. Attorney, San Francisco, Cal., Leavenworth Colby and Keith R. Ferguson, Sp. Assts. to Atty. Gen., and William E. Licking, Asst. U. S. Attorney, San Francisco, Cal., for appellant.

John H. Black and Edw. R. Kay, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and BONE and ORR, Circuit Judges.

DENMAN, Chief Judge.

This appeal is like that in case No. 11519 of the same title, the opinion in which, this day filed, is to be considered with this opinion. 175 F.2d 329. As there, Arrow Stevedoring Company, hereafter called Arrow, was impleaded by the government.

The appeal here arises from a libel on behalf of the administrator of the estate of John Henry Mitchell, the stevedore killed by the falling of the hatch cover under which Arrow caused him and Williams and four other stevedores to work in the No. 4 port hatch of the U.S.S. Edgecomb with knowledge of the danger to which he was exposed.

The Williams case, No. 11519, was tried and decided first. The testimony there was stipulated to be considered as if taken in the instant case. Further testimony was taken. The court found:

"25. It is not true that the hatch cover had been placed or arranged or secured or maintained in a careless or reckless or negligent manner by impleaded respondent Arrow Stevedoring Company, or any servants or agents or employees of said Arrow Stevedoring Company, and it is not true that any servant or agent or employee of the said Arrow Stevedoring Company conducted himself or his activity in a careless or reckless or negligent manner."

The finding is clearly erroneous. Arrow's superintendent Bowers again testified. He reiterated his knowledge of the unsafe condition of the dogs and pins holding up the hatch cover and added to it the testimony that he remained as superintendent until the morning shift men went to work at 7 a. m. He then knew that the ship had not yet secured the hatch cover which he testified the ship's lieutenant had stated he would secure "sometime" during the morning."

In opposition to his testimony in the Williams case that he had told no one of the absent pins and defective dogs, Arrow's night superintendent Bowers stated that he had told O'Shea, Arrow's day superintendent, of the unsafe condition of the raised hatch cover because of the dogs and pins for securing it, before O'Shea's day shift began work at 7 a. m. Bowers also testified he had spoken to the ship's lieutenant of the defective dogs and pins but

this conversation was before the door was raised. He testified that to his knowledge no officer came to the No. 4 hatch while he was there to discover the insecurely raised door. There is no evidence that the ship's officers knew of it. His testimony in the second case is:

"Q. Are you quite certain that at that time you did not report to the lieutenant that this pin was missing out of the dogs? A. I told him the dog—I didn't say anything about the pin—I told him the pins was bent and wouldn't go in.

"Q. You told him the pins were bent and would not go in the dog. What did he say? A. He said he would fix it in the morning or have it fixed.

"Q. Did he say what time? A. No, he didn't say what time, as soon as he had the men available.

"Q. You continued to work on the other side but did not work on the port side when you found that condition? A. That is right.

"Q. Your men worked until what time? A. Until 6:00 o'clock.

"Q. And then left the ship? A. Yes.

"Q. Were you on the ship when the next gang, the morning gang, came on on the 28th? A. I was.

"Q. By the way, who was the man on that gang who held the same position you held on the night shift? A. Michael O'Shea.

"Q. At that time did you report to O'Shea the condition which you had found in the hold? A. I did.

"Q. Did you report to him that the holding devices were defective as you testified here, that is, that this pin was missing? A. I told him that the pin was sprung on the top, *and they would have to see the Navy to get that fixed before they started operating in that hatch.*" (Emphasis supplied.)

O'Shea denies Bowers' statement, stating that Bowers told him nothing about the unsafe condition of the dogs and the pins. Looking at the erect hatch door, the dangerous condition eight feet above did **not** appear. The morning shift was put to work in the hatch at 7 o'clock and almost immediately the hatch door fell and Mitchell was killed.

In making the above finding we do not know whether the district court believed Bowers' conflicting statements or O'Shea's statement that he knew nothing of the condition of the dogs and pins. The finding is erroneous in either case. If Bowers was lying the situation is as in the Williams case. If Bowers told the truth and O'Shea permitted the day shift to work in No. 4 hatch, Arrow's conduct is recklessness rather than ordinary negligence and, a fortiori, Arrow is responsible to the government under the principles controlling in the Williams case, No. 11519.

With regard to the lieutenant's knowledge concerning the dogs and pins, it appears he had the same knowledge we assumed he had in the Williams case. He was advised shortly after midnight that No. 4 port hatch was to be worked and, as seen, he stated that he would attend to securing the hatch cover sometime in the morning and understood that the stevedores would be worked at some other hatch until this was done. He properly could assume that No. 4 port hatch would not be used by the stevedores. No negligence can be imputed to the ship for the death of Mitchell.

We hold that the sole proximate cause of Mitchell's death was the negligence if not recklessness of Arrow's working of the men in the known dangerous condition there existing.

Other contentions raised by Arrow are the same as in case No. 11519 and are disposed of adversely to it for the reasons stated in the opinion in that case.

The decree is reversed and the district court ordered to enter a decree in favor of the government for the amount of its liability to Mitchell, with interest for the breach of Arrow's agreement from the date of the reversed judgment and for its costs.