## UNITED STATES v. ROTHSCHILD INTERNATIONAL STEVEDORING CO.
### No. 12405.

United States Court of Appeals
Ninth Circuit
June 29, 1950.

J. Charles Dennis, U. S. Attorney, Bogle, Bogle & Bates, Seattle, Wash. (Edw. S. Franklin, Seattle, Wash., of counsel), for appellant.

W. E. Du Puis, Seattle, Washington, for appellee.

Before BIGGS and STEPHENS, Circuit Judges, and DRIVER, District Judge.

STEPHENS, Circuit Judge.

Judgment went against the United States and in favor of Dillon for compensatory damages for injuries sustained while working as a stevedore on a ship operated by the United States. Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 933, and Suits in Admiralty Act, 46 U.S.C.A. § 742 et seq., The court dismissed the action against Rothschild International Stevedoring Company. The United States appeals, claiming that the United States should be granted full indemnity over or in the alternative judgment against Rothschild for contribution.

The sole question here is which party or parties were responsible proximately for the accident causing the injury.

■ Part of the evidence was by deposition and part by testimony in open court. We have applied the rule that due regard be accorded the fact that the trial court had the benefit of observing and hearing witnesses. For collection of authorities see Smyth, C.I.R., v. Barneson, 9 Cir., 1950, 181 F.2d 143; Blake v. W. R. Chamberlin & Co., 9 Cir., 1949, 176 F.2d 511.

Dillon was standing in the tween deck of the No. 1 Hold, was in the act of guiding a strong-back into the slot provided as a resting place for the strong-back on the port coaming of said deck, when the strong-back fell and caught libelant's right hand, injuring it.

In the picturesque language of the winch driver, "They had to hook it (the strong-back) up with the spreaders, had to lift it, lower it down to the lower tween decks where I was given the signal to down with with it. Then I was stopped, then they gave me another signal to come back, and then the brake didn't hold and bam, down she went."

The evidence is that the slipping had happened twice before and the winch operator reported it to the ship. Thereafter and before the accident someone from the ship did something in the line of repair. The winch and its brakes constitute a complicated piece of machinery which only a mechanic could repair and its being out of order would not be outwardly apparent.

Rothschild's hatch tender testified that the winches had slipped the previous trip of the ship and he had reported the matter to the ship's electrician and had warned the winch operator that the port winch was defective. He had reported the matter but nothing was done about it.

■ It is clear that both the United States and Rothschild were negligent. It seems equally clear that Rothschild had warning of the defect which was the immediate cause of the accident. With this knowledge Rothschild should not have permitted Dillon to work in this dangerous circumstance as to which it was fully informed. The facts present the case fully within language used in the well known case of The Mars, D.C.S.D.N.Y.1914, 9 F.2d 183, 184: "It may be thought that this was a proper case for dividing damages. I think not. * * * I take it that the distinction there is this: Where two joint wrongdoers contribute simultaneously to an injury, then they share the damages; but where one of the wrongdoers completes his wrong, and the subsequent damages are due to an independent act of negligence, which supervenes in time, and which has as its basis a condition which has resulted from this first act of negligence, in that case they do not share; but in that case we say that the consequences of the first act of negligence did not include the consequences of the second." The Restatement of Torts, Section 441, is to the same effect: "(2) The cases in which the effect of the operation of an intervening force may be important in determining whether the negligent actor is liable for another's harm are usually, but not exclusively, cases in which the actor's negligence has created a situation harmless unless something further occurs, but capable of being made dangerous by the operation of some new force and in which the intervening force makes a potentially dangerous situation injurious. In such cases the actor's negligence is often called passive negligence, while the third person's negligence, which sets the intervening force in active operation, is called active negligence."

█ It is clear from the undisputed evidence that Rothschild used its discretion in permitting Dillon to work where it knew there was a defect which was dangerous, relying upon the chance that nothing would happen. Appellant makes much of the fact that the testimony of Sellman (deck mate, winch driver, hatch tender) was to the effect that the slipping was "when you are coming to a stop, sometimes they would drop before the brake caught" and not "after they were stopped." We discern no point in the argument. The winches were defective without any question of a doubt and whether they failed to work satisfactorily in stopping or upon or after stopping does not materially affect the situation. See Barbarino v. Stanhope S. S. Co., 2 Cir., 1945, 151 F.2d 553.[1]

We think the uncontradicted testimony of the case entitles the United States to full indemnity over.

Affirmed, reversed, remanded.

---

1. Sellman, Rothschild's hatch tender, testified as follows:

"Q. As hatch tender, you were in charge of the gang? A. That's right.

"Q. Before you or Rigney started to use those winches, did you test them? A. I don't think so, especially.

"Q. As a matter of fact, you always test winches, don't you, to make sure they are satisfactory? A. Usually, run through the notches and see if they run.

"Q. And that was done by you or Mr. Rigney? A. I think he drove the first hour.

"Q. And they were satisfactory, weren't they? A. I don't know. You drive them whether they are satisfactory or not.

"Q. You know, you were there, don't you? A. Sure, I was there.

"Q. There wasn't anything wrong with the winches up until Mr. Dillon's accident, was there? A. Yes.

"Q. What was it? A. The same thing, when you are going to land a load, sometimes it will slip two or three feet before it stops.

"Q. How many times did that occur before Mr. Dillon's injury? A. Maybe half a dozen times, maybe not.

"Q. Did it, half a dozen times? A. When I was over the hatch, I always make a practice to give him the signal to stop quite a ways up.

"Q. I am asking you how many times the winches slipped after they were stopped on the evening of Mr. Dillon's injury before his accident occurred? A. After they were stopped? I didn't say anything about them slipping after they were stopped.

"Q. What did you say was wrong with them? A. When you are coming to a stop, sometimes they would drop before the brake caught.

"Q. How many times did that occur? A. I didn't keep track of it.

"Q. Was it a matter of any importance to you? A. Not an awful lot, as long as it didn't spill any loads or land a load on anybody.

"Q. Do you think the winches were defective in any way? A. To that extent, yes.

"Q. Did you report that alleged condition to the foreman, Mr. Petri? A. I don't know whether I did nor not.

"Q. Wouldn't you if you felt it was dangerous or hazardous? A. I tried it the previous trips and didn't get any results. I know on these Army ships, it is no use.

"Q. Did you report this condition to Mr. Petri? A. I think Paul did.

"Q. Mr. Rigney reported it? A. I think so.

"Q. You didn't report it? A. I don't think I said anything about it to him.

"Q. As a matter of fact, as a member of the Longshoreman's Union, you have a contract that you are not permitted or required to work under unsafe conditions? A. That's right.

"Q. If you find winches are unsatisfactory or unsafe, you close the job down until they are repaired? A. Well, not unless they are awful bad. Otherwise, we would be going home pretty early pretty often.

"Q. But you yourself in charge of the gang made no complaint either to Mr. Petri or to any of the ship's officers about the alleged condition of this winch? A. I don't think I did that night. I don't remember of it, anyway.

"Q. After this accident happened to Mr. Dillon, did Mr. Rigney continue to drive the winches? A. I believe he did.

"Q. And you had no more trouble with them, did you? A. Well, the same thing.

"Q. That same condition persisted? A. Sure.

"Q. At any time that evening, did you call that to anybody's attention? A. I think I told the gang."