**UNITED STATES of America,
Appellant,**

v.

**Benjamin HARRISON and Jones Steve-
doring Company, Appellees.**

**No. 15054.**

United States Court of Appeals
Ninth Circuit.

April 29, 1957.

George Cochran Doub, Asst. Atty. Gen., Paul A. Sweeney, Herman Marcuse, Leavenworth Colby, Attys., Dept. of Justice, Washington, D. C., Keith Ferguson, Sp. Asst. to Atty. Gen., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for appellant.

John H. Black, Edward R. Kay, Henry W. Schaldach, San Francisco, Cal., for appellees.

Before HEALY, LEMMON and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Benjamin Harrison, a longshoreman employed by Jones Stevedoring Company, filed libel against the United States, wherein it was alleged that the government was the owner of S.S. Private John R. Towle and that Harrison slipped, while unloading the vessel, on an accumulation of oil because of the negligence of the government agents. It was alleged also that the vessel was, by the accumulation, unseaworthy. The court permitted the Stevedoring Company to be impleaded by the government based upon allegations that, pursuant to the terms of the stevedoring agreement, the Company had agreed to hold the government harmless against injuries caused by the Company. This third party complaint also alleged that the negligence of the Company caused the injuries of Harrison.

Harrison was one of a gang assigned to unload jeeps stowed on the shelter deck of Hatch No. 1. This deck was practically covered with oil, apparently from crankcases of the jeeps. Harrison noticed this and asked his gang foreman to have the condition remedied. There was substantial evidence that the gang boss and the walking boss appealed to officers who were apparently in charge of the unloading and an officer who was apparently in control of the ship to have the condition remedied. Not only was this not done, but the bosses and the men were urged by these officers to hasten the unloading so that the ship could go somewhere else to load for the convenience of the agents of the government. The men of the Stevedore were told, if they were careful, they could work the vessel and get it out of that port and on to another so that no delay would be incurred by the government and the ship could load the following day. Thus admonished, the men and the bosses agreed not to stop work on account of the dangerous condition, but to proceed. After the jeeps on the shelter deck were unloaded from Hold No. 1, Harrison and his partner began removing the strong backs from the shelter deck hatch in order to gain access to the jeeps to be unloaded from the deck below. In lifting out the fourth of these, Harrison slipped after the beam tilted. The beam fell across his leg and he suffered injuries.

Within fifteen minutes after the injury, government agents brought in sand and made the deck safe.

■ The District Court awarded judgment against the government and in favor of Harrison in the sum of $2,000.00. It found that the injury sustained by Harrison was caused solely, directly and proximately by the unseaworthiness of the vessel and the negligence of the agents of the government in permitting oil to accumulate and remain on the shelter deck. The court specifically held that the injuries of Harrison were not "solely and/or directly and/or proximately caused by the carelessness and/or negligence" of the Stevedoring Company. The trial court further found that the Company had not failed to use reasonable care for the prevention of accidents and that the injuries of Harrison were not "caused or

contributed to in whole or in part by the improper and/or careless and/or negligent manner in which respondent impleaded [Jones Stevedoring Company], its officers, agents or employees, conducted themselves or their activities aboard said vessel." Thereupon, the court dismissed the third party complaint.

But it is argued that the gangs of the Stevedore must have quit work or refused to start work or the Stevedore became concurrently liable. Here again, there are express findings that there was no negligence upon the part of any of them. Substantial evidence supports this finding. The presence of the oil was brought immediately to the attention of the only agents of the government on the ship who seemed to be exercising any authority. Sand or sawdust was asked for, and the response was that it was not available. There were movements by the men to cease work. But those in apparent authority for the government urged them not to cause a stoppage and urged the convenience of the government in having the vessel loaded at another port the next day. It was not negligence to yield to these earnest representations.

It is contended that the identity of these persons was never established and that the contract requires these matters to be taken up with the "Contracting Officer." But the persons to whom the requests for sand or sawdust were made were the only ones exercising authority over the unloading and over the ship. These agents took the responsibility of urging that the unloading go on. It cannot be successfully contended that the Stevedore must stop the work and hunt up the contracting officer, wherever he might be, in order to protect itself. It cannot reasonably be contended that the government, which had officers in charge of the ship who directed this unloading and who knew of the unseaworthiness, still had no officer or employee who could get sand or sawdust on the deck. This argument is negatived by the fact that some one of these officers was present urging and arguing that there should be no stoppage and that the work go forward. This circumstance may have been of great weight with the trial judge, and it certainly weighs with this Court. There was no controverting proof. No one was called by the government attorneys to deny that the incident took place as the stevedores have represented. The Receiving Officer was not called. The Commanding Officer of the S.S. Private John R. Towle was not called. No officer or member of the crew was called. The conversations and demand for sand or sawdust, testified to by the longshoreman and the foreman, were not denied by anyone. No showing of unavailability of such witnesses was made.

The findings of fact must be upheld. The case is thus at an end.

However, the attorneys for the government lay great stress upon the contract between the Stevedoring Company and the Contracting Officer. The specific exception to "clause holding the government harmless" reads:

"The Contractor [Stevedoring Company] shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to property or bodily injury to or death of persons:

"(1) If the unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor is causing such damage, injury or death, and the Contractor, its officers, agents and employees, by the exercise of due diligence, could not have discovered such unseaworthiness or defect of gear or equipment, or through the exercise of due diligence could not otherwise have avoided such damage, injury or death.

"(2) If the damage, injury or death resulted solely from an act or omission of the Government or

its employees or resulted solely from proper compliance by officers, agents or employees of the Contractor with specific directions of the Contracting Officer."

■ The attempt is made to say that the decision favoring the Stevedore holds necessarily that this indemnity contract is void as contrary to public policy. We do not so hold. This contract is given controlling weight in this Court now as it has been in the past. Properly construed, the agreement only restates the law as the cases have laid it down. Judge Denman, speaking for this Court, held this type contract valid in the case of United States v. Arrow Stevedoring Co., 9 Cir., 175 F.2d 329, certiorari denied 338 U.S. 904, 70 S.Ct. 307, 94 L.Ed. 557. There the Stevedore was actively negligent in propping up the hatch cover in his own way in such manner that it fell, injuring one of his employees.[1] However, the ship was responsible therefor because she became unseaworthy by 'the act of the Stevedore, but was properly given recourse under the contract against the person whose act was the proximate cause of the accident. The findings of fact of the District Court were overturned because clearly erroneous. With this case we agree fully.

But the instant case is entirely different on its facts. Here there are express findings by the trial court that the Stevedore was not at fault or negligent in any manner, and the accident was the sole fault of the agents of the government. The very terms of the express contract absolve the Stevedore, if these are the facts. We would find that these are the facts, if this were our province, and in any event we affirm the findings of the trial court. Thus no recovery can be had upon the contract of indemnity.

■ The findings are not clearly erroneous. The argument of the government is that, if the Stevedore saw there was oil on the shelterdeck, he was bound *by the terms of the contract* not to work there until he had remedied the defect himself or had been expressly ordered by the Contracting Officer, apparently in person, to proceed.

The thesis that the contract thus established a rule of law and that the trial court could not make findings of fact to the contrary cannot be accepted.

The fact that there was a contract of indemnity in this therefore does not lead to a different result. Where the Stevedore was actively negligent, thus causing the ship to be unseaworthy and there was no such contract, liability was upon him alone. United States v. Rothschild Intern. Stevedoring Co., 9 Cir., 183 F.2d 181. Where the Stevedore expressly assumed a specific duty which he failed to perform, he was held liable where there was no indemnity contract whatsoever. American President Lines v. Marine Terminals Corporation, 9 Cir., 234 F.2d 753, certiorari denied 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161. In Ryan Stevedoring Co., Inc., v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, where there was no contract or bond of indemnity, the shipowner, which had been held liable for an injury caused by the improper stowage of pulp rolls by the Stevedore, was held entitled to recover against the latter on a contract to perform all of the stevedoring operations of the shipowner in a proper and safe manner at the time and place. It was there said, 350 U.S. at pages 134 and 135, 76 S.Ct. at page 238:

"Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman

---

1. Further, the stevedoring work was performed in face of the knowledge that an officer of the ship agreed to raise the hatch door "sometime during the day shift" in which the injury took place, and where there was available a clamp and turnbuckle by which the cover could have been secured erect, but which was not so employed by the Stevedore. Neither element is present in the instant case.

for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. Respondent's [shipowner's] failure to discover and correct petitioner's [stevedore's] own breach of contract cannot here excuse that breach."

The contract of indemnity cannot be construed to shift the burden of keeping the ship seaworthy at all times to the Stevedore. The finding here is that the Stevedore was not at fault. The burden of the shipowner cannot be shifted to him. It cannot be said that he could not enter into the performance of the duties to which the shipowner had bound him by contract to perform. Such action would have been a breach thereof. There was no breach here of a specific obligation of the Stevedore rendering the ship unseaworthy.

The obligation was here directly against the shipowner. As was said in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 100, 66 S.Ct. 872, 880, 90 L.Ed. 1099:

"It would be anomalous if such a policy, effective to control such issues, were less effective when the question is simply whether the stevedore is entitled to the traditional securities afforded by the law of the sea to men who do the ship's work. Nor does it follow from the fact that the stevedore gains protections against his employer appropriate to the employment relation as such, that he loses or never acquires against the shipowner the protections, not peculiar to that relation, which the law imposes as incidental to the performance of that service. Among these is the obligation of seaworthiness. It is peculiarly and exclusively the obligation of the owner. It is one he cannot delegate. By the same token it is one he cannot contract away as to any workman within the scope of its policy. As we have said, he is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities. That the law permits him to substitute others for responsibilities peculiar to the employment relation does not mean that he can thus escape the duty it imposes of more general scope. To allow this would be, in substantial effect, to convert the ancient liability for maritime tort into a purely contractual responsibility. This we are not free to do."

The argument now advanced would relieve a ship and its owner of the continuous duty of keeping her seaworthy.[2] This is not a case where unseaworthiness is caused by the Stevedore himself and the ship is held to absolute liability as a result.[3] But to read into this clause liability of the Stevedore, who was under contract to work the vessel, because he did not risk breach of his contract by refusing to unload in the face of an open and notorious condition for which the officers and crew were entirely responsible, would place a premium upon unseaworthiness of the ship and negligence by her crew and officers. This spurious argument would reverse the maritime policy of ages, which has even firmer foundations under modern conditions.

■ Any attempt to require the Stevedoring Company to hold the government harmless under circumstances

---

2. Seas Shipping Co., Inc., v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; States Steamship Co. v. Rothschild International Stevedoring Co., 9 Cir., 205 F.2d 253. See also, Amerocean Steamship Co., Inc., v. Copp., 9 Cir., 245 F.2d 291.

3. Compare Ryan Stevedoring Co., Inc., v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

found in this case, by stipulations of a contract or otherwise, would be void. The unseaworthiness of this vessel created a non-delegable duty upon the agents of the government to render her seaworthy immediately.[4] The defect was not latent, but was patent to everyone who saw the deck. If the defective condition had been concealed and the Stevedoring Company had been the first to discover it, then a burden might have been placed upon the latter under the contract.[5] But the duty to keep the ship seaworthy, where the conditions are open and notorious to all who looked, is not only non-delegable, but continuous upon the shipowner, master and crew. A finding of the trial court, since it is overwhelmingly supported by evidence, closes this avenue of escape for the agents of the government. It reads:

> "It is true that said injury was solely, directly and proximately caused by the unseaworthiness of the said vessel and the negligence and carelessness of the respondent, United States of America, its agents and employees, in permitting said oil to accumulate on said deck, well knowing of the presence of said oil on said vessel, such presence constituting a hazard to libelant and other persons working on said deck."

There is no doubt that the pool of lubricating oil on the 'tween-deck was a hazard and rendered the vessel unseaworthy. The duty of using due care to have a seaworthy vessel is nondele-gable. The officers and crew of the ship were negligent also in permitting the condition to exist when the Stevedore gangs came aboard, without attempting to have sand which was delivered to the vessel within fifteen minutes after the accident immediately available before work started. None of this was the responsibility of the Stevedore or its men.

■ But it is said that the Stevedoring Company must be held under the contract, since it, through the exercise of due diligence, could otherwise have avoided such damage or injury.[6] But here the contention is met with other findings of the court, of which one at least furnished a specific answer. It reads:

> "It is not true that Jones Stevedoring Company failed to use reasonable care for the prevention of accidents likely to occur for any reason."

The fact that the Stevedore tried everything except a work stoppage or a sit-down before working under these conditions is certainly sufficient to support this finding. And this continuance of work was induced by agents of the government where it is probable no attention by the gangs would have been paid to wheedling or pressure of officers of a vessel in private employment. A stoppage of work on a government contract has implications of unpatriotic action. Since these agents used this argument impliedly, they should not be relieved of the consequences of the un-

---

4. In Johnson Line v. Maloney, 9 Cir., 243 F.2d 293, the shipowner was held liable to a longshoreman for breach of its nondelegable duty to render the ship seaworthy and make it a safe place to work. The shipowner had failed to sweep up wheat and wheat dust which made the decks dangerously slippery and caused the injury to the longshoreman.

5. See United States v. Rothschild International Stevedoring Co., 9 Cir., 183 F.2d 181.

6. Reliance is placed upon a case which held that the stevedore contracting with the shipowner to unload and transport wool by lighter to the pier was liable where he failed to protect the wool from damage by rain, irrespective of the failure of the shipowner to furnish covers. Metcalfe v. Chiarello, 2 Cir., 294 F. 29. It would seem the failure of the Stevedore to get adequate covers was a breach of the express obligation of the Stevedore to unload without harm to the cargo. In any event, the failure did not render the ship unseaworthy. This case has no possible analogy to the case at bar.

seaworthiness which was the primary and proximate cause of the damage and injuries.

There should be no method of shifting the burden of patent unseaworthiness, which is the primary and proximate cause of an accident, from the shipowner, whether the owner be a private party or the United States.

Affirmed.

HEALY, Circuit Judge.

I dissent.

The contract between the United States and appellee Stevedoring Company expressly provided (in Clause 12 thereof) that the Company undertook to indemnify the government where injuries were caused either in whole or in part by the Company's fault. The only exceptions to indemnification were if the accident was caused by the unseaworthiness of the vessel, and the Stevedoring Company either could not have discovered the unseaworthiness, or could not have prevented the accident; or if the accident was caused solely by the ship; or if it resulted from proper compliance by the Stevedoring Company with "specific directions" of the government's contracting officer. The clause, so far as here material, is set out on the margin.[1]

This case falls squarely within the indemnity provision, and none of the exceptions provided for therein are applicable. It is plain that the accident was in part caused by the Stevedoring Company's negligence. Its authoritative representatives on board the vessel, namely, its walking-boss, Eckstein, and its gang-boss, Jensen, were fully alive to the fact that oil covered the shelter-deck, thus rendering the area dangerous to the longshore workers. They could and should have stopped the work unless and until the hazardous condition was remedied. Cf. United States v. Arrow Stevedoring Co., 9 Cir., 175 F.2d 329, 331. Nor did the failure of the ship to supply sand or sawdust relieve the Company of its responsibility in the premises. To the contrary, it had the duty to be diligent in endeavoring to obtain the material from other sources. Metcalfe v. Chiarello, 2 Cir., 294 F. 29, 30.[2]

[1] "Clause 12, Liability and Insurance
"a. The contractor
* * * * *
"(2) shall be responsible for and shall hold the Government harmless from any and all loss, damage, liability and expense for cargo, vessels, piers or any other property of every kind and description, whether or not owned by the Government, or bodily injury to or death of persons occasioned either in whole or in part by the negligence or fault of the Contractor, his officers, agents or employees in the performance of work under this contract. The general liability and responsibility of the Contractor under this clause are subject only to the following specific limitations:
"(b) The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to property or bodily injury to or death of persons:
"(1) If the unseaworthiness of the vessel or failure or defect of the gear or equipment furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing such damage, injury or death, and the Contractor, its officers, agents and employees, by the exercise of due diligence, could not have discovered such unseaworthiness or defect of gear or equipment, or through the exercise of due diligence could not otherwise have avoided such damage, injury or death.
"(2) If the damage, injury or death resulted solely from an act or omission of the Government or its employees or resulted solely from proper compliance by officers, agents or employees of the Contractor with specific directions of the Contracting Officer."

[2] The Company and its active representatives were entirely familiar with the San Francisco Bay area. Its foreman, Jensen, for example, had been working there as a longshoreman for some thirty years. How readily the requisite material could have been obtained is shown by the testimony of the Port Transportation Officer, who acted as a liaison between the vessel and the dock. Very shortly after the accident this officer learned of the accident and, for the first time, of the oily condition of the deck. Upon request from the vessel for some substance to cover the oil, he secured sand from a shed lo-

In sum, the Company could have avoided the accident either by stopping the work, or by obtaining material which would render the shelterdeck a safe place in which to continue operations. There is no showing whatever that any effort was made in the latter direction other than by asking the ship to obtain the material. Accordingly, the trial court's findings that the injury was not caused in whole or in part by the Stevedoring Company's negligence are patently erroneous.

The Stevedoring Company being negligent, the only remaining ground for absolving it of liability under the indemnity agreement would necessarily be under paragraph b(2) of Clause 12, namely, that Harrison's injury resulted "solely from proper compliance by officers, agents, or employees [of the stevedoring company] with *specific directions* of the Contracting Officer." [Emphasis supplied.] The trial judge made no finding of any directions, specific or otherwise, having been given by that officer, or by anyone representing the vessel, to continue the work despite the hazardous condition obtaining on the shelterdeck. The testimony of gangboss Jensen was that the longshoremen continued working because Eckstein,[3] the Stevedoring Company's walkingboss, asked them to. It is plain from Jensen's testimony that no orders or directions were given the longshoremen on the subject by anyone, it being simply left to them to determine for themselves whether or not they would continue to work. Jensen's account of the matter was in no way controverted. Accordingly, not only is there no finding that would bring paragraph b(2) of Clause 12 to bear upon the case, there is no evidence that would support such a finding had it been made.

I gather that my associates, while appearing at times to protest the contrary, are of the view that the indemnity provision involved here is void as being against public policy. However, this circuit has honored such agreements, whether express or implied, in cases involving factual situations similar to the one before us. See United States v. Arrow Stevedoring Co., supra; United States v. Rothschild Intl. Stevedoring Co., 9 Cir., 1950, 183 F.2d 181; American President Lines v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753. See, also, Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 141, 76 S.Ct. 232, 100 L.Ed. 133.

There being no evidence in the record to support the dismissal of the third party claim against the Stevedoring Company, the cause should be reversed with directions to enter judgment requiring the Company to indemnify the government pursuant to its contract.

---

cated about 300 yards from the vessel, and had it delivered within fifteen or twenty minutes after Harrison had suffered his injury.

3. Eckstein himself was not called as a witness.