319 F.2d 457
 William BALLWANZ, to the Use of Liberty Mutual Insurance Company, Appellant,
v.
ISTHMIAN LINES, INC., a body corporate, Appellee.
ISTHMIAN LINES, INC., a body corporate, Appellant,
v.
JARKA CORPORATION OF BALTIMORE, Appellee.
 No. 8786.
 United States Court of Appeals Fourth Circuit.
 Argued January 22, 1963.
 Decided June 5, 1963.
 
 John J. O'Connor, Jr., Baltimore, Md. (O'Connor & Preston, Baltimore, Md., on brief), for appellant, William Ballwanz, to the use of Liberty Mut. Ins. Co.
 Southgate L. Morison, Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for appellee-appellant, Isthmian Lines, Inc.
 Eugene A. Edgett, Jr., Baltimore, Md., on brief for appellee, Jarka Corp. of Baltimore.
 Before SOBELOFF, Chief Judge, J. SPENCER BELL, Circuit Judge, and MICHIE, District Judge.
 J. SPENCER BELL, Circuit Judge.
 
 
 1
 The plaintiff, a longshoreman, one of a gang of eight, was engaged in loading a cargo of truck bodies in the 'tween deck area of The S.S. STEEL WORKER, owned and operated by Isthmian Lines, Inc. The truck bodies were crated in wooden frames measuring between 30 and 35 feet in length, eight feet in width, and four to four and one-half feet in height. To lift them from the pier into the hold, a heavy wire sling was placed under each end of the crate approximately eight feet from the edge. A wooden spreader was placed between the wires of the sling at the top of the crate to prevent the weight of the body exerted on the heavy metal wire from crushing in the crate at the top. The spreaders were four by sixes, eight feet long, and made of oak wood. The ends of the spreaders were notched to prevent the wires from slipping off. When the crates were landed on four by fours placed in the square of the hatch to receive them, the sling would be relieved of its weight and the spreaders would drop down onto the top of the crate. The longshoremen would remove the slack wire cable from the respective ends of the crate and take a half hitch with the wire sling around each end of the spreaders. They did this on instructions relayed to them from up on the deck. The winches would then hoist the wire slings with the spreaders in them out of the hold and proceed to pick up another crate. After this had been done about the third or fourth time, one of the spreaders fell out as the sling was passing up and "dived" back into the hold, striking the plaintiff on the leg, and injuring him. There was no real conflict in the testimony as to how the injury occurred. It was apparent that the wire of the sling was too stiff to hold the wooden spreaders securely. The parties' witnesses differed as to the use of this type of spreader on the water front. The plaintiff and his coworkers all testified that this was the first time they had used a spreader which was not bolted or in some other way affixed to the sling so that it would not fall off. The stevedore foreman testified that this type of spreader was used occasionally. He estimated that in five years this type of spreader had been used perhaps as often as forty times.
 
 
 2
 The case was submitted to the jury on special issues which were answered as follows:
 
 
 3
 "A. Under all the facts of this case, was the SS STEEL WORKER, at the time and place of the casualty complained of, unseaworthy with respect to the loading gear used at the No. 5 hatch?
 
 
 4
 "Yes..... No X
 
 
 5
 "B. Under all the facts of this case, was Isthmian Lines, Inc., the Master, or any member of the crew of the SS STEEL WORKER at the time and place of the casualty complained of, negligent?
 
 
 6
 "Yes X No.....
 
 
 7
 "If your answer to both A and B are `No', it is not necessary to answer the remaining questions.
 
 
 8
 "If your answer to either A or B is `yes', you should answer the remaining questions.
 
 
 9
 "C. If you find unseaworthiness or negligence, or both, existed at the time and place of the casualty complained of, was such unseaworthiness or negligence, or the combination of both, a proximate cause of the injuries sustained by Mr. Ballwanz?
 
 
 10
 "Yes..... No X
 
 
 11
 "D. Did any negligence of the Plaintiff cause or contribute to the accident of which he complains?
 
 
 12
 "Yes X No......
 
 
 13
 "If your answer to D is `No' you need not answer `E'. If your answer to D is `Yes' you should answer `E'.
 
 
 14
 "E. If you find negligence on the part of Mr. Ballwanz and that such negligence was a proximate cause of the injuries sustained, to what extent or degree percentagewise, did such negligence contribute to the happening of the casualty?
 
 
 15
 "50%
 
 
 16
 "F. If your answer to either question A or B and your answer to question C were `yes', at what amount do you fix the damages, apart from any question of contributory negligence?
 
 
 17
 "$..........."
 
 
 18
 On the basis of these answers the Court entered judgment for the defendant and the plaintiff appeals.
 
 
 19
 In the factual context of this case it was error to enter a verdict for the defendant on the basis of the jury's answers to the special issues submitted. On these issues the jury found the ship to be negligent. No evidence submitted to the jury tended to show the vessel negligent except in one particular and that was with reference to the inadequacy of this equipment and the manner of its use. If the ship was negligent, that negligence consisted of its failure to prohibit the inadequate equipment from being used, or if it was being used improperly then to stop such improper use. No other hypothesis or theory than this was advanced by either counsel or Court until after the jury's verdict was returned. We agree with the analysis of the trial judge in this respect. In a colloquy with counsel for the shipowner, who was complaining of the absence in the charge of any instruction concerning the negligence of the stevedore company, who was third party defendant, the Court said:
 
 
 20
 "* * * if you (ship owner) were negligent, your negligence operated — your knowledge of the spreader, operated right up to the moment of the time these men had the choice either to do it in a dangerous way, as you say, or to hand it up. I don't think any intervening negligence of Jarka, except the negligence in which the plaintiff himself participated, could be an intervening insulating negligence."
 
 
 21
 In short, the theory upon which the case was tried was that the injury was caused by the negligence of either the ship owner or the plaintiff or both. If in the context of these facts, the ship owner was negligent, as the jury found, then his negligence could not but have been a proximate cause of the accident. That the plaintiff's negligence contributed 50% to his injury was to be considered in the computation of damages but could not relieve the defendant of his share of the responsibility for the causation of the injury which in fact resulted from the use of this equipment. In fact the jury found both the ship owner and the seaman negligent; but it found that the seaman's negligence contributed only 50% to the happening of the casualty. In the narrow factual setting of this case, we find the conclusion inescapable that these findings are inconsistent with the finding that the ship owner's negligence was not at least a proximate cause of the plaintiff's injury. This inconsistency would not support a judgment for the defendant based upon a speculation that some third person had contributed the remaining 50% of negligence which caused the accident.
 
 
 22
 In this connection, we also think it was error to charge the jury that they might consider Ballwanz's failure to "pass up" the spreader by hand instead of "slinging it up" as evidence of contributory negligence on his part. The plaintiff longshoreman was at the bottom of the hierarchy of command and we fail to see how he can be held responsible for the manner of operations of the stevedore company. The defendant ship owner had a general responsibility for the manner in which the loading operations on his vessel were carried out. If it was negligent and dangerous to "sling" the spreaders up instead of passing them up, then this manner of operation had been going on under the general supervision of the ship owner and the particular supervision of the stevedore company for nearly three hours before the injury occurred.
 
 
 23
 While it is true that an effort must be made to reconcile jury verdicts, nothing in the Seventh Amendment removes the appellate court's duty to correct errors of law, Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 366, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) (dissenting on other grounds). We find, as discussed above, that the jury's answers to the special issues submitted to it were irreconcilable.
 
 
 24
 We are also of the opinion that the Court erred in its charge to the jury in three respects: first, in defining unseaworthiness, its emphasis upon the necessity of finding fault on the part of the vessel could easily have led the jury to confuse the concept of fault with the common law concept of negligence, and second, the Court in its repetitive insistence that the equipment need be only reasonably fit for the purpose for which it was being used grossly de-emphasized the affirmative aspects of the doctrine of seaworthiness as laid down by the Supreme Court. Finally in the factual aspects of this case, it was error to charge the jury that in considering the seaworthiness of the gear they might take into consideration the plaintiff's failure to complain or to demand additional materials to make it better suited to the purpose for which it was being used.
 
 
 25
 In its charge to the jury the Court emphasized the fact that unseaworthiness cannot occur without fault of the ship owner. However true it may be as an abstract proposition of law that unseaworthiness in a broad general sense cannot exist without fault on somebody's part in that it constitutes a breach of one's duty, it is not a fault in the ordinary everyday use of the term. Certainly no layman would accept as a "fault" many of the conditions which the Court has held to constitute unseaworthiness — by way of illustration, a door knob which comes loose, The H. A. Scandrett, 87 F.2d 708 (2 Cir.1937); a scaffold which breaks because it is made up with defective rope when the ship owner has furnished sound rope, Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); a ladder with a broken rung, Dixon v. United States, 219 F.2d 10 (2 Cir.1955); grease or oil on deck, United States v. Harrison, 245 F.2d 911 (9 Cir. 1957); a shackle with a hidden defect which broke in use, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); a shower without hand rails, Krey v. United States, 123 F.2d 1008, (2 Cir.1941); a transitory condition not called to the attention of the ship owner, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Gryzbowski v. Arrow Barge Co., 283 F.2d 481 (4 Cir. 1960).
 
 
 26
 The courts have long recognized this difference between the obligations and responsibilities which the ship owner owes to the members of the crew of his vessel as compared to an employer on shore side, Socony Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Thus the obligation of seaworthiness is absolute in character and is not satisfied by the exercise of reasonable care on the part of the ship owner, nor is it affected by relinquishment of control to another, such as a stevedore employer of a longshoreman. Patterson v. Alaska S. S. Co., 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). Should the jury find unseaworthiness the maritime law would make the defendant liable for any injuries suffered by the plaintiff in this case by reason of the unsafe condition of the loading gear, including the unattached and unsecured wooden spreader, even if the ship owner had no knowledge of the defect and no opportunity to discover it or correct it. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1943); Read v. United States, 201 F.2d 758 (3 Cir. 1953). Thus the Court's emphasis upon the necessity of finding fault, when considered with reference to the balance of the charge, was an unjustifiable dilution of the doctrine of seaworthiness as it has been developed by the Supreme Court.
 
 
 27
 The above error of the Court was emphasized by its subsequent repetitive insistence that the equipment used need be only reasonably fit for the purpose for which it was intended. Thus the Court's statement:
 
 
 28
 "It is only obligated to have equipment which is reasonably safe for carrying out the ship's work, and to determine what is reasonably safe equipment for such purposes, the Jury may consider what is customary in the port at the time of the occurrence and may only find such equipment makes a ship unseaworthy if it creates an unreasonable risk to those performing the work."
 
 
 29
 This emphasis of the "negative" aspects of the duty by its use of the terms "reasonably", "reasonable", and "unreasonable", constantly repeated in defining the nature and extent of the duty, diluted and adulterated the character of the warranty of seaworthiness. Interspersed and repeated as they were throughout that portion of the charge devoted to defining and explaining the doctrine of liability for unseaworthiness, these words and phrases were tantamount to suggesting a requirement that the jury must find negligence in order to hold the ship owner liable, an obviously incorrect standard which might well have confused and misled the jury. We repeat that liability for injury resulting from unseaworthiness is not to be based on concepts of negligence. The cases cited above indicate how slight a defect is sufficient to constitute a breach of this warranty of unseaworthiness.
 
 
 30
 We also think it error for the Court to have charged the jury in this case that in considering the seaworthiness of the vessel they might take into consideration the plaintiff's failure to complain or to demand additional material to make the equipment better suited for the purpose for which it was being used. In its charge the Court said:
 
 
 31
 "In connection with the issue of seaworthiness, you may also consider the fact that no complaint was made by the plaintiff or by any of the other members of the gang to the gang carrier or by the gang carrier to the foreman about the spreader, and you may consider that the plaintiff and his fellows did not ask for wire or cord to tie or lash the spreader to the wire sling or cable.
 
 
 32
 "You should consider the situation of the ship with the main deck and this 'tween deck about seven feet below, and you may consider the fact that the men at the forward end of the crate, instead of sending the spreader up in the way the men at the rear end did, passed it up just by handing it up onto the top deck, which was seven feet above them."
 
 
 33
 This instruction is strikingly similar to that given by the District Court in Gryzbowski v. Arrow Barge Co., 283 F.2d 481 (4 Cir. 1960), and held improper by this Court.
 
 
 34
 It is the ship owner's absolute and nondelegable duty to furnish to seamen and to others to whom that duty is owing a seaworthy vessel. "A longshoreman does not assume the risk of negligence or unseaworthiness and this is so whether his action is based on negligence or unseaworthiness." Klimaszewski v. Pacific-Atlantic Steamship Co., 246 F.2d 875 (3 Cir. 1957); Palermo v. Luckenback Steamship Co., Inc., 355 U. S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3 (1957), modified, 355 U.S. 910, 78 S.Ct. 337, 2 L.E.2d 271 (1958).
 
 
 35
 The plaintiff was one of a gang of eight longshoremen working in the hold of the defendant ship. He had no responsibility for, or authority over, any of his fellow workers. His duty was to do his work as he was instructed. He was in no sense obligated to protest against the method of operation which he had been instructed to follow or to devise a safer method, nor was he obligated to call for additional or different equipment. If the doctrine of seaworthiness means anything, it is totally repugnant to the doctrine of assumption of risk on the part of seamen. The plaintiff in this case was at the very bottom of the hierarchy of command, and the effect of the charge was to place too much responsibility upon him for the over-all operations of the stevedore. The courts have held that where a seaman has a choice between a seaworthy or an unseaworthy part of a ship his use of the latter will not relieve the owner of his responsibility. Palermo v. Luckenback Steamship Co., Inc., supra. Certainly if a seaman may deliberately choose an unseaworthy part of a ship without losing his right of recovery then he is under no obligation to complain about his orders or to insist on better equipment. Nor do we think that the error was cured by the Court's later reference to the doctrine of assumption of risk in that part of the charge relating to the issue of plaintiff's contributory negligence.
 
 
 36
 In Gryzbowski v. Arrow Barge Co., 283 F.2d 481 (4 Cir. 1960) this Court held the District Court in error in charging that the doctrine of unseaworthiness did not extend to transitory unsafe conditions, citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960). Specifically, it held that the District Court was in error in charging the jury that they might consider on the question of seaworthiness the fact that no one (including the plaintiff) had complained to the ship owner because neither notice of the condition nor lack thereof was material. It also stated "But, in determining seaworthiness, no significance attaches to the fact that no one complained of the alleged unsafe condition. Neither notice of the condition or lack thereof was material." The Court added that such an instruction was in conflict with the Supreme Court's pronouncement that "what is evolved is a complete divorcement of unseaworthiness liability from concepts of negligence".
 
 
 37
 Thus the Court held that the required standard of seaworthiness must be met whether anyone complains or not, and to permit a jury to consider the absence of complaints or demands for other or additional equipment is to detract from the standard required. The Court's holding that the remainder of the charge set forth a correct exposition of the law cannot be construed as upholding the charge which was given in this case when considered in the context of its facts. Indeed, with the exception of its reference to complaints, no isolated statement of the charge given in this case could be said to be incorrect as a matter of law. It is correct appellate language, but in its overwhelming emphasis on the negative aspects of the doctrine it was well calculated to mislead a jury, and the fact that the jury found the vessel guilty of negligence but the gear to be seaworthy is indicative of that fact.
 
 
 38
 For the reasons stated herein, the case will be remanded to the District Court with the direction that the plaintiff be awarded a new trial.
 
 
 39
 Reversed and remanded.