Frank PISCOPO, Plaintiff,

v.

UNITED STATES of America,
Defendant and Third-Party Plaintiff,

American Stevedores, Inc., Third-Party
Defendant.

Civ. A. No. 12346.

United States District Court
E. D. New York.

Nov. 24, 1958.

Samuel P. Fensterstock, New York City, for plaintiff, by Jacob Rassner and Francis J. Nicosia, New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., for Eastern Dist. of New York, Brooklyn, N. Y., for defendant and third-party plaintiff, by Benjamin H. Berman, Atty. in Charge, and William A. Wilson, Atty., New York Office Admiralty and Shipping Section, Dept. of Justice, New York City, of counsel.

Garvey & Conway, New York City, for third-party defendant, by George J. Conway, New York City, of counsel.

BYERS, Chief Judge.

In this Federal Tort Claim action, the plaintiff asks damages for his personal injuries sustained on September 21, 1951 while he was engaged in shifting cargo on the upper level of Army Base Pier 13, Staten Island.

The complaint was filed December 27, 1951 and the action was dismissed for failure to prosecute on June 9, 1953. Thereafter, it was restored to the calendar by order dated April 19, 1954. Trial was had on October 27, 1958.

The plaintiff when injured was in the employ of American Stevedores, Inc. (American) which was brought into the cause by complaint filed May 28, 1954, whereby the defendant seeks relief against American as alleged indemnitor, in the event that plaintiff is granted a recovery.

The fact of injury is not in dispute, nor how it occurred. The plaintiff was operating a "hi-lo" or mechanical crane on the pier; while so doing, a crate or carton fell from the top of a tier or pile of cargo elements, and struck him on the head.

If the hi-lo had been equipped with a guard extending over the driver's seat, the injury would not have occurred. So much is not in dispute.

The questions for decision are:

a. Was the defendant negligent in providing a hi-lo not equipped with a guard?

b. Was the plaintiff to be charged with contributory negligence for operating the machine known by him to be so deficient in structure?

c. Did the duty arise on the part of American, to indemnify the defendant against liability to the plaintiff, under the circumstances revealed by the evidence?

d. The nature and extent of the plaintiff's injuries.

An answer to the first question calls for some understanding of the nature and functioning of the machine which concededly was provided to the plaintiff by the defendant.

The defendant's brief may be quoted on this subject:

"That hi-lo was a gasoline-driven machine operated by controls similar to those used to control an automobile. Its specific purpose was served by a mast and boom arrangement constructed at its forward end whereby, by manipulation of additional controls by the operator, a 'carriage', to which were affixed horizontal forks or 'blades' could be raised and lowered between floor level and the upward limit of reach of the boom. The blades of the carriage were designed for insertion between the two platform elements of a pallet, and by this method the weight of the pallet and its cargo came to rest on the fork blades, and could thereby be moved about, raised or lowered, at the discretion of the operator."

The plaintiff was one of an "extra labor" group employed by American, whose supervisor was D'Acunto (sometimes referred to in the testimony as Sunny).

The same brief contains the following:

"At the outset of the working day, D'Acunto selected certain three-man groups of extra-labor workers with

one man of each group, previously licensed by the Army authorities, designated as operator of a 'hi-lo' or fork-lift truck, the others designated as his helpers. The plaintiff was one of those assigned a machine. Assisting him were helpers, Ralph De Rosa and Carlo Liggio.

"D'Acunto assigned plaintiff and his helpers to the task of tiering, or stacking, palletized cargo on the upper level of the pier. That work involved assembling a number of cargo-laden pallets from various places on the floor of the pier and building these into stacks by vertical grouping. The stacks which plaintiff was thus instructed to build should be, according to D'Acunto's testimony, approximately 18 feet above the floor level, although the overall heights of the several stacks would vary somewhat, he said, inasmuch as the individual palletized cargo itself varied from 3 to 5 feet in height.

"To perform that work, D'Acunto instructed plaintiff to obtain a hi-lo from the yard nearby where a number of hi-los and cargo-handling equipment of various types were stored by the Army for use on the three Staten Island Terminal piers."

It appears that the cargo which was being tiered consisted of spare parts of army trucks.

The plaintiff applied for a hi-lo to Ceserano who was an Army employee, acting as an Army Base foreman in charge of material handling devices, such as lifts and hi-los, all of which were in his custody. The foreman issued hi-lo #25 to the plaintiff (see Exhibit 1, the trip ticket) knowing that it lacked a shield or guard. He said that he did not recall any protest made by plaintiff to him for the issue of a hi-lo without a guard or shield, thus contradicting plaintiff's testimony on that subject. Also that he did not recall a telephone conversation with Sunny repeating an alleged protest by plaintiff to his own foreman, to the same effect.

He also said that he did not know the precise nature of the job to which plaintiff had been assigned on that day, and that "low-boom" machines customarily had no guards.

It is not a cause for wonder that after a lapse of seven years he did not recall the circumstances as related by plaintiff.

The latter's version was that he protested to Ceserano against the assignment of this machine to him because of the absence of a guard; that the latter told him to take Number 25 which was the last hi-lo available, but that one with a guard would be substituted for it as soon as possible. Also that he reported this conversation to D'Acunto who in turn telephoned to Ceserano in the effort to secure a guarded hi-lo for the plaintiff.

D'Acunto corroborated plaintiff as to the latter's report to him of his conversation with Ceserano, and that the latter had said something to plaintiff about coming back later. He denied that he had spoken to Ceserano about the absence of a shield on hi-lo #25.

The margin of persuasion as to the fact of a protest by plaintiff to the Army foreman is slight, but is deemed to be sufficient to tip the scales in his favor as to this aspect of the case. This means that the court finds that plaintiff did protest the allocation of hi-lo #25 to him because it had no guard.

Since there was no other machine available, the foreman had to decide whether the work should go forward as to plaintiff and his helpers, or cease until a hi-lo with a guard should become available.

In cross-examination by American, D'-Acunto testified that the extra-work to be done on the pier was laid out by the Army officer in charge, and that the witness checked with him the night before, in laying out the work for the morrow; and that arrangement was verified the morning of each day. That testimony was not contradicted. It means that the work as laid out for September 21, 1951 had been laid out by the Army officer on

September 20th, and verified on the morning of the 21st, so that the tiering of cargo in which plaintiff was engaged when he was injured, had been ordered by the defendant and was so carried forward.

Since both elements of the task, namely the job itself and the means to accomplish it, were directed by the defendant, responsibility for the mishap must be visited upon it, unless the evidence indicates that it was not an act of negligence (contrary to paragraph Sixth of the complaint) to provide a hi-lo without a guard.

As to this it is clear:

(a) The plaintiff was injured because a pallet which he was endeavoring to place on a pile, from an extended height—about 13 or 14 feet—fell upon him, which it could not have done had he been protected by the guard.

(b) There were 60 or 70 hi-los used at this Base, of which all but 10 had guards. That fact was testified to by Ceserano, and is consistent only with a recognition of the requirement of a guard for reasons of safety. The same witness said that guards were not necessary on the "low-boom" machines, i. e., those not required in tiering or assembling low piles of cargo in pallets. It is a fair inference that the ten machines without guards, were mostly "low-boom" machines.

■ This court is of the opinion that a hi-lo without a guard should not have been issued to plaintiff without first inquiring whether he was expected to conduct a "high-boom" operation. Since No. 25 was capable of so operating, its issue without inquiry as to the kind of work which plaintiff was expected to do, and the incidental risk of "high-boom" operation by a machine not equipped with a guard, must be deemed to have constituted negligence on the part of defendant, and it is so found.

The contention by both the defendant and American that plaintiff was contributorily negligent in using hi-lo #25, having first protested its inadequacy, required but brief comment. In the first place there is credible testimony that he was assured that the machine would be replaced by one equipped with a guard, so soon as one was available. He had no discretion to exercise, but was required to abide by the decision of the Army foreman in charge of equipment.

Moreover, he operated the hi-lo successfully and without incident during his morning shift, and for two hours or so in the afternoon of September 21st, which sufficiently demonstrated his skill, to foreclose any argument on that subject.

■ It is therefore found that plaintiff was free from contributory negligence.

■ The contention next to be examined is that made by the defendant, that American was negligent in permitting plaintiff, its employee, to operate this hi-lo at all, thereby bringing into operation that portion of the stevedoring contract which provides that the contractor shall be liable to the defendant for personal injuries "occasioned either in whole or in part by the negligence or fault of the contractor" (Art. 12, Sec. (a) 1 and 2).

Section b(2) stated that no duty to hold the Government free from liability shall arise if the injury "resulted solely from an act or omission of the Government or its employees, or resulted solely from proper compliance by its officers, agents and employees with specific directions of the Contracting Officer."

Since the issuance of hi-lo #25 to the plaintiff was the act of Ceserano, the Army foreman in charge of equipment, and the lack of a guard was not only obvious, but the subject of a protest as has been found, on the part of the plaintiff, it is a tenuous argument at best to urge that American was negligent in failing to reject the equipment and thus halt the operation of work projected by the Army Officer in charge as has been stated.

The deficiency was not that of the stevedore's gear and equipment, but of

the tool or instrumentality owned by the Army, and contractually provided by it to perform a task, the details of which were by it, laid out and prescribed.

The distinction is clear between such a state of affairs and that examined in United States v. Arrow, etc. Co., 9 Cir., 175 F.2d 329, upon which the Government relies. There an insecure hatch cover fell and caused the injury complained of; the court held that the duty to indemnify arose because the stevedore permitted its men to proceed with their task beneath the unsafe hatch cover, with knowledge of the hazard itself.

In the opinion on page 331, the following occurs:

"The government in no way participated in the wrongful use of the door, (hatch cover) which otherwise could have been made secure in the manner described * * *."

Here the Government not only participated in the use of the unguarded hilo, it provided it, having first laid out the plan which entailed its use.

Weyerhaeuser S. S. Co. v. Nacirema Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 decides that the duty of a stevedore to respond to a shipowner under principles of indemnity does not automatically follow, where the injured employee recovered against the ship; it is a question of fact for separate adjudication.

Ryan Stevedoring Co. v. Pan-Atlantic, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. Here indemnity was exacted of the stevedore in a case in which no written contract controlled the relation of the shipowner to the stevedore. The accident was the result of improper stowage of cargo by the stevedore, i. e. negligence on its part.

Parenzan v. Iino etc. Kaisya, 2 Cir., 251 F.2d 928. Here the stevedore provided unfit dunnage, whereby plaintiff was injured. A settlement of the latter's cause against the ship was had, and then the latter sought indemnity against the stevedore, and prevailed.

The court on appeal held that the stevedore's negligence was shown to be active, since its failure to take corrective measures by continuing to discharge cargo with knowledge of the defective condition of the stow, was the primary cause of the injury involved.

The circumstances at bar are clearly remote from those examined in that case.

A/S J. Ludwig Mowinckels Rederi v. Commercial, etc., 2 Cir., 256 F.2d 227. The indemnity contract in this case, so far as quoted in the opinion, contained no such clause as that quoted above (Sec. b(2)). It had to do in terms with "the negligence or fault of the stevedore, etc."

The opinion states (at page 232): "* * * we decide that Commercial must indemnify Mowinckels under the express provision in their contract."

Shannon v. United States, 2 Cir., 235 F.2d 457. This case more closely resembles in principle the one at bar than any other of those cited by the defendant.

The employee of the stevedore was injured as the result of his removing a "bull" wire from a winch, which seemingly had operated satisfactorily for about four prior days. During that removal the wire sprang up and struck the libelant in the eye, causing serious injury.

The wire cable in question had been supplied by the Government to the stevedore, and was seen to contain kinks when first rigged on the winch. That aspect was not the basis of decision. The opinion contains the following (at page 459):

"But we do not rest our decision on that ground, (kinky condition) since we think Smith (stevedore) liable over to the owner even if, because of the kinks, the cable was not in 'good working order.' For Smith had expressly agreed with the owner to 'rig and unrig the ship's gear' which Smith used. That agreement, we think, included, as a promise implied in fact, the following: If Smith knew of a defect in any such gear, Smith would either remove the defect or notify the own-

er. This express undertaking constituted an agreement to indemnify the owner for any loss resulting from a breach by Smith. The express agreement distinguishes this case from American (etc.) v. Matthews, 2 Cir., 182 F.2d 322, 324–325. See Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133."

The contract involved is quoted in part at page 458, second column, and contains no clause such as has been herein quoted (Sec. b(2) of Article 12.).

Nor has reference been made to any provision which can be likened to the duty "to rig and unrig" as to the precise duties here assumed by American.

It is to be remembered that hi-lo #25 was not to be deemed unsafe equipment lacking a guard, except when used for "high-boom" work. It is true that no direction was issued by D'Acunto to plaintiff to confine his activities to "low-boom" work, and the argument that such omission played its part in the plaintiff's injury is not without plausibility.

It is not deemed to be persuasive however in the light of plaintiff's testimony that Ceserano had promised him a hi-lo with a guard as soon as one should become available. The initial negligence was that of the Government, and I am unable to construe the contract between these parties so as to call upon American to indemnify the Government against its own negligence.

The cause pleaded in the third-party complaint is: (Para. Tenth)

"That the third party defendant (American) failed to properly supervise the plaintiff in his work activities and failed to properly instruct the plaintiff in marine safety practices and particularly with respect to the stacking and/or removal of cargo from piers through the use of mechanical equipment."

"Thirteenth: If the plaintiff suffered any injury and is entitled to any . recovery of damages * * * it is because of the fault or negligence, in whole or in part, of the ; third party defendant * * * in failing to carefully perform the obligations and duties resting upon it in carrying out its stevedoring work and * * * the defendant and third party plaintiff should be entitled to indemnity etc."

The issue so presented is found not to have been sustained by the Government, in that:

(a) There is no testimony to support the allegation first above quoted of failure to supervise or instruct the plaintiff.

(b) There is no testimony to support the second allegation quoted of failure on the part of American to fully perform its contractual duties because it did not reject hi-lo #25 which was duly issued to its employee plaintiff, in the face of his protest and request for such a crane equipped with a guard.

As I see it, the American was at all times acting under the instructions of the Army as to the work being done on September 21, 1951 and that included the instrumentality for the performance of arranging the cargo involved.

The contract as quoted frees the American from responsibility under Art. 12, b(2), in that the plaintiff's injury resulted solely from proper compliance by American "with the specific directions of the Contracting Officer" and it is so found.

In my opinion the argument for the Government fails to distinguish between the affirmative issuance of a hi-lo not equipped with a guard, which under the circumstances was negligence, and the mere failure of American to warn the plaintiff that it was a hazardous thing to perform the task which the Government had projected—with the machine which it provided—since the plaintiff already knew that, or he would not have made the request that he did.

The difference between the tasks assumed in Shannon, and those at bar, and the difference in the terms of the respective contracts, is the reason for the present holding, that Shannon is not dispositive of this case.

### Nature and Extent of Injury.

 On the date of the injury, the plaintiff was nearly 63 years of age and a vigorous and active man. At the time of trial, it was apparent that he still is.

The facts show that as the result of being struck on the head by a pallet of cargo, he suffered a laceration of the scalp which did not render him unconscious, and an x-ray examination promptly held after his arrival at Dr. Crane's office, was negative for fracture.

The plaintiff's complaints were of headaches, dizziness and a stiffness in the neck which persisted, and according to medical testimony was the result of cervical sprain. The condition was either disabling in fact, or was so believed to be by the plaintiff; after the lapse of four or five months, it became more of the latter than the former.

His earnings prior to the accident averaged $125 a week, but by reason of the necessarily intermittent nature of his employment, it cannot be said, nor has it been shown, that he earned $6,500 a year, as asserted in the plaintiff's brief.

In 1954 he earned $477.90 as a longshoreman and $630 as a union organizer; that was his occupation during 1954 for the first five months.

It satisfactorily appears that he was capable of working as a longshoreman and so held himself out for work which did not call upon him to function at sufficiently high levels to be affected by the dizziness of which he believed he was aware. As to the latter, there is testimony that he even did that kind of work at his own home during the year 1957.

Having in mind the plaintiff's age and his adaptability as shown, to other employment, it cannot be said that the injury that he suffered disabled him completely for a very long period of time in view of the testimony of Dr. Carpiento that the plaintiff as of February 2, 1952 could do light work.

Taking the evidence on this subject as a whole and having in mind the intermittent demand for longshoremen's services, it is thought that an award for loss of earning would be adequate in the sum of $4,500. To this should be added, for pain and suffering, $2,500. The notes of the court do not indicate that there was any proof offered to cover medical expenses, and since counsel did not order the record for the information of the court, no award can be made in the absence of application to reconsider in that respect.

As a result of the foregoing, the decision is as follows:

Judgment is awarded to the plaintiff against the defendant in the sum of $7,000, with costs, and the third-party complaint is dismissed, with costs, to be settled on notice.