Frederick MISURELLA, Plaintiff,

v.

ISTHMIAN LINES, INC., Defendant and Third-Party Plaintiff,

v.

INTERNATIONAL TERMINAL OPERATING CO., Inc., Third-Party Defendant.

United States District Court
S. D. New York.
March 19, 1963.

Harvey M. Jasper, New York City, for plaintiff; Ezekiel Jasper, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant and third-party plaintiff; Thomas Coyne, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for third-party defendant; Edward Ash, Joseph Arthur Cohen, New York City, of counsel.

EDWARD WEINFELD, District Judge.

The plaintiff, a longshoreman employed by International Terminal Operating Co., Inc., was overcome by carbon monoxide fumes while engaged in cargo loading

operations in the No. 3 lower hold of the S. S. Steel Flyer, owned by the defendant, Isthmian Lines, Inc. He seeks to recover from the defendant damages for the resulting injuries upon claims of unseaworthiness and negligence. Isthmian, in case it is found liable to the plaintiff, seeks an indemnity from International, the third-party defendant, for breach of its warranty of workmanlike performance.

The essence of plaintiff's claim against the shipowner is that, although the vessel had ventilating equipment, it was not put to use or kept in operation for adequate ventilation of the No. 3 hold; thus, the carbon monoxide fumes given off by hi-los operated, one by the plaintiff and another by a co-worker, in that hold were permitted to accumulate.

The use of hi-los in holds of vessels by stevedores for clearance of dunnage, debris, and cargo loading purposes is usual. The hi-los in the instant case were powered by gasoline and gave off carbon monoxide. Ventilation of the hold when such hi-los are used is generally achieved by removal of the hatch covers or ship's pontoons over the hatch being worked, by the ship's ventilating system and at times by portable blowers supplied by the stevedores and which are operated by means of the ship's electric current.

The S. S. Steel Flyer's ventilating system for the No. 3 hatch consisted of two types. One was a natural intake located some fifty feet high on the kingpost with no forced draft. The other was a forced air and blower system which was controlled from a resistor house on the main deck. It is this latter system about which the plaintiff's claim revolves.

The evidence abundantly supports a finding that the hatch covers on the decks of the No. 3 hold were only about one-third or halfway opened; that the ship's ventilating system was not put into operation, nor did it function during the entire period plaintiff worked the hi-lo in the hold; that it was not put into use until after he had succumbed by reason of carbon monoxide poisoning; and also that no auxiliary portable blower was in operation. Indeed, these matters do not appear to be seriously challenged by the defendant or the third-party defendant, although plaintiff's right to recovery is questioned.

The plaintiff started to work on the hi-lo in the No. 3 lower hold at about 8:45 A.M. on March 24, 1959. Before entering the hold he requested both the mate of the vessel and the stevedore foreman to put the blowers on. After he had been working awhile, he yelled up several times from the hold to the deck where he observed the mate, as well as stevedores, and renewed his request. His testimony in this respect was confirmed by several fellow employees, one of whom testified that attempts to bring a portable blower into play were futile because the electric juice or current of the ship was not on. Another longshoreman testified that several times he asked the chief mate to turn on the ship's ventilating system, but the mate responded he could not find the keys to the resistor house (where the switch was located), which was locked.

After working in the hold about an hour and a half, plaintiff felt nauseous and dizzy and experienced great difficulty in breathing. However, he continued to work in the hold until about 11:15, when he was assisted by co-workers up the ladder to the deck where he collapsed and was given artificial respiration. He was removed from the vessel on a pallet to the dock, from where he was taken to a hospital by ambulance. On the way it was necessary to administer oxygen. The hospital diagnosis was "carbon monoxide poisoning."

Upon all the evidence the Court finds and concludes that the defendant was both negligent[1] and breach-

1. See DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir., 1962); Palazzolo v. Pan-Atlantic S.S. Corp., 211 F.2d 277 (2d Cir., 1954), aff'd sub nom. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

ed its warranty of seaworthiness.[2] As to the latter claim, the fact that the vessel had an available ventilating system does not preclude a finding of unseaworthiness. A shipowner's duty does not end if it provides adequate and seaworthy equipment; its duty is a continuing one and requires that such equipment be furnished when and where the work is to be done.[3] The failure to put it in effective operation under the existing conditions rendered the vessel just as unseaworthy as if it lacked such equipment. The ship's officers knew that hi-los were being used in the holds in connection with cargo operations; that when so used, they gave off poisonous fumes; and unless the hold was properly ventilated it was not a reasonably safe place in which to work. Under the facts presented the vessel was not reasonably fit for its intended use. The situation here is no different than if a ship had adequate tools and gear but kept them under lock and key and did not make them available to the men when required.

■ As to the negligence claim, the Court has already noted that the chief mate was requested on more than one occasion to put the ventilation system in operation, but failed to do so. Further, apart from actual notice, the condition which rendered the hold an unsafe area had existed for sufficient time to charge the defendant with constructive notice.

■ We next consider the question of damages. Plaintiff was confined to the hospital, to which he was removed from the job, for four days and did not return to work thereafter for about two months. He also claims loss of wages over a four and a half month period following a second hospitalization in February, 1961 for diagnosis and treatment, diminution of earning capacity due to inability to work overtime, and loss of income due to irregular attendance at his job. Plaintiff, from the time of the accident, has experienced a fairly constant pain in his left side and left arm, radiating down to his fingers, with accompanying numbness, difficulty in breathing, shortness of breath and dizziness, symptoms which were not present before the accident. His condition is diagnosed by his physician as a lung and a heart ailment, which he testified is permanent. The not unusual controversy developed between the medical experts to to whether the plaintiff's condition is permanent and, if so, whether it was pre-existing or was proximately caused by the carbon monoxide poisoning.

The Court finds that the plaintiff has sustained his burden of proof; that he had a pre-existing asymptomatic coronary insufficiency and a lung condition which were aggravated or activated by the carbon monoxide poisoning. However, this has not prevented the plaintiff, with the exception of the two periods noted above following his respective hospitalizations, from engaging in his usual occupation in substantially the same degree as prior to the accident, as his earnings thereafter demonstrate, even making allowance for increased wage rates. Accordingly, the Court finds damages due to loss of wages for six and one-half months amounting to $2,700, plus $655 for hospital and medical expenses, and the further sum of $15,000 for the nature and extent of his injuries, including those which were permanent, and for pain and suffering—a total of $18,355.

■ The question remains whether the defendant has sustained the defense of contributory negligence on the part of plaintiff so that the damages are subject to diminution. The plaintiff became ill as the work progressed. He became nauseous, experienced a terrific headache, and had difficulty in breathing after working about an hour and a half. As he continued to work, the hold was smoke filled from the exhaust of the hi-lo. He know of the need for ventilation, for, as already found, he called up several times

2. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

3. Mahnich v. Southern S.S. Co., 321 U.S. 96, 104, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

requesting that the ventilation system be put in operation. Yet he persisted in carrying on until about 11:15, this notwithstanding that he observed fellow employees go up for fresh air at one time or another. It may seem rather odd to hold him liable because he persisted in sticking to his job, but under all the circumstances it was reasonable to require him to forego his task and follow the example of his co-workers. The Court finds that the amount of damages should be reduced to the extent of fifty per cent by reason of plaintiff's contributory negligence.

█ Finally, we consider the claim of indemnity by the shipowner against International, the stevedore and third-party defendant. This rests upon International's warranty in favor of Isthmian that the stevedoring job would be performed in a safe, careful and workmanlike manner.[4] The warranty extends not only to stowage, cargo handling, and use of proper and safe equipment, but also to providing a reasonably safe place for those of its employees engaged on the job. And if the stevedore by a breach of its warranty of workmanlike performance brought into play a condition which casts the shipowner in liability to the employee, then it is liable over.[5]

The stevedore here recognizing these principles, stresses that Weyerhaeuser S. S. Co. v. Nacirema Operating Co.,[6] holds that a shipowner is only entitled to indemnity for damages imposed upon him by reason of the stevedore's breach of the warranty of workmanlike service *"absent conduct on its [the shipowner's] part sufficient to preclude recovery."* (Emphasis supplied.) The Court did not there define just what conduct by a shipowner would preclude recovery, nor have subsequent cases distilled the essential elements necessary to bar such recovery. However, other rulings have given direction to the circumstances under which notwithstanding that the shipowner itself was at fault, the stevedore was still held liable for indemnification. The teaching of Crumady v. The Joachim Hendrik Fisser [7] and its progeny [8] is that the mere fact the shipowner was at fault does not, in and of itself, bar indemnity. Neither does the circumstance, as here argued by the stevedore, that the shipowner "was at least a joint and concurring wrongdoer" defeat recovery. It is too late to argue that concepts of active and passive negligence or primary and secondary tortious conduct are the yardsticks which determine the shipowner's rights to indemnity.[9] Crumady

4. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).

5. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

6. 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958).

7. 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

8. Williams v. Pennsylvania R. R. Co., 313 F.2d 203 (2d Cir., 1963); Pettus v. Grace Line, Inc., 305 F.2d 151 (2d Cir., 1962); Drago v. A/S Inger, 305 F.2d 139 (2d Cir.), cert. denied, Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962); Smith v. Jugosalvenska Linijska Plovidea, 278 F.2d 176 (4th Cir., 1960); Dunbar v. Henry Du Bois' Sons Co., 275 F.2d

304 (2d Cir.), cert. denied, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960); Hugev v. Dampskisaktieselskabet Int'l, 170 F. Supp. 601 (S.D.Cal.1959), aff'd sub. nom., Metropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l, 274 F.2d 875 (9th Cir.), cert. denied, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960); American Export Lines, Inc. v. Revel, 266 F.2d 82 (4th Cir., 1959); Calmar S.S. Corp. v. Nacirema Operating Co., 266 F.2d 79 (4th Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959). See also, Ferrigno v. Ocean Transport, Ltd., 309 F.2d 445 (2d Cir., 1962); DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir. 1962); Paliaga v. Luckenbach S.S. Co., 301 F.2d 403, 409 (2d Cir., 1962).

9. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Williams v. Pennsylvania R. R. Co., 313 F.2d 203 (2d Cir. 1963).

imposes a rigid duty upon the stevedore in the performance of the warranty of workmanlike service which the Court likened "to a manufacturer's warranty of the soundness of its manufactured product." [10] There the fact that the shipowner supplied the defective equipment which the stevedore brought into play did not bar recovery on the contract of indemnity.

In any event, here the stevedore urges that the shipowner's conduct was so egregious that it should bear the loss itself. In its effort to avoid liability under the warranty, the stevedore points to the fact that the switch controlling the ventilating system was in the resistor house the keys to which were in the exclusive possession of the chief officer and the ship's electrician; that the chief mate, as well as the stevedore's foreman, were requested to put the proper ventilating system into effect, but failed to do so, that is, until after plaintiff had been brought to the deck; that although it (the stevedore) had brought a portable blower aboard the ship, this could not be used because the vessel had failed to supply the necessary current. The stevedore dismisses the contention that the portable blower was of no use because it was defective by reason of a broken wire, contending it could have been repaired readily by the ship's electrician. Essentially, these are the circumstances upon which the stevedore relies to ward off indemnification.

■ In the instant case the ventilating system was available to serve its intended purpose. All that was required was that it be put into operation. The non-use of the ventilating system is the hard core of the shipowner's liability to the plaintiff. True, the chief mate was one of those who failed to cause it to function. But he was not directly concerned with cargo operations. This had been turned over by the shipowner to the stevedore. It had been engaged for that very purpose. The engagement of the stevedore carried with it the warranty of workmanlike performance which obligated it, among other matters, to see that the longshoremen worked under reasonably safe conditions—an obligation to the shipowner independent of its duty to its employees to provide them with a reasonably safe place in which to work. Its duty in that regard required that the necessary equipment be used when and where the work was to be done.[11] It created, pro tanto, an unseaworthy condition when it failed to bring the ship's ventilating system into play and permitted the plaintiff and its other employees to work in the hold as the hi-los continued to generate poisonous gas. Under its warranty, the stevedore had a duty to correct, or cause the ship's officers to correct, any dangerous condition brought about by the non-use of the ventilating system—and it mattered not that the shipowner was responsible for the underlying condition if workmanlike performance would have eliminated the risk of injury.[12] The stevedore either should have insisted that the mate who had the keys and the control of the ventilating equipment put it into operation, or else should have ordered the men out of the hold. The warranty was effective the moment the stevedore boarded the vessel to perform its services.[13] Indeed, the short of it is that if the hold was an unsafe area for the men to work in, or by the use of hi-los would be so rendered, they should not have been permitted to

10. 358 U.S. 423, 428–29, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959).

11. See Drago v. A/S Inger, 305 F.2d 139 (2d Cir.), cert. denied, Daniels & Kennedy, Inc. v. A/S Inger 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962). Cf. Mahnich v. Southern S.S. Co., 321 U.S. 96, 104, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

12. See Pettus v. Grace Line, Inc., 305 F.2d 151 (2d Cir. 1962); Drago v. A/S Inger, 305 F.2d 139 (2d Cir.), cert. denied, Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962).

13. See Ferrigno v. Ocean Transport Ltd., 309 F.2d 445 (2d Cir., 1962).

start the job until proper ventilation was in effect.

The stevedore's breach is compounded rather than ameliorated by the fact that it did not "knock" the men off the job when it brought its own portable blower aboard the vessel and there was, as the stevedore claims, no electric current available to service the auxiliary unit. Finally, the stevedore's safety engineer, whose specific task was to insure reasonably safe working conditions for the men, did absolutely nothing to see either that the hold was adequately ventilated or the men ordered off the job until conditions were corrected—that is, until after the plaintiff had been overcome by the fumes. True, the ship on its own was negligent and the vessel was rendered unseaworthy by the non-use of the ventilating equipment, and perhaps a different result would follow if the common law rule applicable to joint tort-feasors prevailed, but it has been made abundantly clear that this concept is inapplicable when breach of a contractual duty is the basis of liability. Just as a shipowner's breach of contract in failing to supply adequate equipment is not sufficiently material to excuse the stevedore from its contractual duty to render workmanlike service,[14] so here it follows equally that where the shipowner does supply adequate equipment, the stevedore is not exonerated for its breach in failing to use or cause the use of such equipment.

The Court is constrained to hold that the circumstances of this case do not constitute "conduct on its [the shipowner's] part" which relieves the stevedore of its breach of warranty. The cases pressed by the stevedore in which a right over was denied do not require a different conclusion. All but one antedated Crumady.[15] And that one, from the District Court of Puerto Rico, involved specific directions from the ship's officers to the stevedore to continue unloading, despite the stevedore's complaints as to the defective equipment and its reluctance to continue unloading operations.[16]

The defendant is entitled to judgment on its claim for indemnity in the sum of $9,177.50, plus counsel fees and expenses as stipulated by the parties.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

14. See Pettus v. Grace Line, Inc., 305 F.2d 151 (2d Cir. 1962); Drago v. A/S Inger, 305 F.2d 139 (2d Cir.), cert. denied, Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed. 2d 232 (1962).

15. Smith v. Pan-Atlantic S.S. Corp., 161 F.Supp. 422 (E.D.Pa.1957), aff'd 254 F. 2d 600 (3d Cir., 1958); United States v. Harrison, 245 F.2d 911 (9th Cir., 1957); Amerocean S.S. Co. v. Copp, 245 F.2d 291 (9th Cir., 1957); Hagans v. Farrell Lines, Inc., 237 F.2d 477 (3d Cir., 1956).

16. Torres Cruz v. Hudson S.S. Co., 206 F.Supp. 216 (D.Puerto Rico 1962). See also, Caputo v. United States Lines Co., 202 F.Supp. 600 (E.D.N.Y.1962).