James THOMPSON, Appellant in No. 14943

v.

TRENT MARITIME CO., Ltd., Appellee in No. 14943, Appellant in No. 14913,

v.

B. H. SOBELMAN & CO., Inc., Appellee in No. 14913.

Nos. 14913, 14943.

United States Court of Appeals Third Circuit.

Argued May 18, 1965.

Decided Nov. 16, 1965.

**633**

Avram G. Adler, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for James Thompson, plaintiff-appellant in 14943.

Thomas F. Mount, Philadelphia, Pa. (Rawle & Henderson, Philadelphia, Pa., Thomas L. Anderson, Washington, Pa., on the brief), for appellee, Trent Maritime Co., Ltd., in 14943 and appellant in 14913.

Francis E. Marshall, Philadelphia, Pa. (Sydney C. Orlofsky and Stephen A. Cozen, Philadelphia, Pa., on the brief), for B. H. Sobelman & Co., Inc., appellee in 14913.

Before STALEY, HASTIE and GANEY, Circuit Judges.

GANEY, Circuit Judge.

James Thompson, a longshoreman and citizen of Pennsylvania, won a general verdict of $22,500 for damages resulting from an injury he received on February 27, 1953, aboard the S.S. Duke of Athens, a vessel owned and operated by Trent Maritime Company, Ltd., a corporation organized and existing under the laws of the United Kingdom. B. H. Sobelman & Co., the stevedore and employer of Thompson, which contracted to unload the No. 3 hold of the vessel, obtained a verdict of no liability in the third-party action against it by the shipowner for indemnity. The shipowner filed post-trial motions for a new trial, the one in the original action *in personam* set forth excessiveness of the verdict as a ground, and the other in the third-party action listed as the grounds alleged error by the trial court in refusing to charge as requested by the shipowner, and the jury's disregard of the court's charge as to the obligation of the stevedore to the shipowner. The trial court, on October 4, 1963, allowed the motion for a new trial in the original action if Thompson "failed to remit all the damages above the sum of $15,000 * * * within ten days from service of the order." [1] It denied the motion for a new trial in the third-party or indemnity action. 222 F.Supp. 221 (E.D.Pa., 1963). Thompson refused to remit $7,500, and submitted to a new trial limited to the issue of damages. At the second trial the jury found them to be $10,000. Judgment on this verdict was entered on March 19, 1964.

Thompson has appealed from the $10,000 judgment and requests that that judgment and the order of October 4, 1963, as amended, be reversed and the judgment of $22,500 entered May 7, 1963, in the original action be reinstated.

The shipowner has appealed from the judgment, also entered on May 7, 1963, in

1. Six days later the district court amended the order granting the new trial so as to restrict it to the issue of damages.

favor of the stevedore in the third-party action, and asks that the denial of its motion for a new trial in that action be set aside. The stevedore's motion to dismiss the shipowner's appeal as being untimely was denied by this court. 343 F.2d 200 (C.A.3, 1965).

## I.

■ Thompson contends that the trial court had no basis for awarding a new trial on the issue of damages in the original action. The court had allowed the motion on the ground that in its considered judgment the $22,500 verdict was grossly excessive and bore no proportion to the injury received or the damages sustained. In its opinion the only explanation for the size of the verdict was the jury's failure to isolate the foot injury from the subsequent amputation of Thompson's left leg in December of 1957. The court felt that a "fair amount consistent with the injury and the damages sustained would be $15,000." It reached the latter amount by attributing $660.50 to special damages (i. e., $560.00 in lost wages and $100.50 for medical expense), and the remainder of $14,339.50, without apportioning it among those various items, to (1) pain and suffering—past and future, and (2) loss from impairment of earning power resulting from the injury to Thompson's right foot.

We think the trial court's action in ordering a remittitur is without support in the record.[2] Our examination of that record fails to disclose that any "undesirable or pernicious influence" regarding damages had obtruded into the trial,[3] and the shipowner points out none. It argues, agreeably with the trial court's conclusion, that the only explanations for the amount of the verdict was either the jury's sympathy for Thompson's unfortunate physical condition or that body's failure to separate damages flowing from the foot injury in the one instance and the amputation in the other. The probability that either one of these possible explanations is correct is too remote.

Unquestionably the amputation of Thompson's leg below the left knee as the result of an injury he received on December 28, 1957, was a complicating factor in the ascertainment of damages in the original action. In fairness to the shipowner and the stevedore, the effect of the second injury on Thompson's earning power was a fact which had to be exposed to the jury. The latter's awareness of this injury was not an insurmountable obstacle to its reaching a just verdict as to damages. Neither the shipowner nor the stevedore raised any objection on that account. At the beginning of its charge the trial court told the jury that this case must be decided upon rules of law and justice and not sympathy. Regarding the issue whether damages were payable and in what amount, the court instructed the jury no less than five times that whatever amount they might award Thompson must be related solely to his right foot injury. During this part of the charge it again reminded the jury that they must eliminate entirely from their minds any sympathy or other emotion insofar as the 1957 occurrence is concerned.

■ Additionally, the trial court, in concluding that the verdict was excessive, failed to take into account certain factors, supported by the evidence, foremost among them being Thompson's diminution of wages after the injury. His formal education ended in grammar school, and his primary occupation was the installing of hardwood floors. Since that work was both seasonal and unsteady, he augmented his earnings by working on the waterfront. Though that work was not as safe as hardwood floor work, it was better paying. At the time of injury to his right foot, he was 43 years of

2. See Neese v. Southern Ry., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955), where the Court held in a *per curiam* opinion, in reversing the court of appeals, that the trial court's denial of a new trial upon a remittitur on grounds that the verdict

was excessive will not be set aside where the action of the trial court is not without support in the record.

3. See Lind v. Schenley Industries, Inc., 278 F.2d 79, 90 (C.A.3, 1960).

age and prior to that injury he had no physical disabilities. From the beginning of 1951 to the time of trial in May of 1963, his wage record is as follows:

| Year | Longshoreman Wages | Hardwood Floor Wages | Total Annual Wages |
|---|---|---|---|
| 1951 | $ 647 | $3,297 | $3,944 |
| 1952 | 1,482 | 3,266 | 4,748 |
| 1953 [4] | 1,540 | 2,334 | 3,874 |
| 1954 | 964 | 2,720 | 3,684 |
| 1955 | — | 2,686 | 2,686 |
| 1956 | — | 3,616 | 3,616 |
| 1957 [5] | 206 | 1,342 | 1,548 |
| 1958 | — | — | — |
| 1959 | — | — | — |
| 1960 | — | — | — |
| 1961 | — | 701 | 701 |
| 1962 [6] | — | 45 | 45 |
| 1963 [7] | — | — | — |

(Chart No. 1)

Even though he earned more as a longshoreman in 1953, the year in which his right foot was injured, than in previous years, it does not follow that he did not sustain a loss of wages in that year if the evidence showed that he could have earned a larger amount had he not been injured. See, for example, Wiles v. N. Y., C. & St. L. R. Co., 283 F.2d 328, 332 (C. A.3, 1960), cert. denied, 364 U.S. 900, 81 S.Ct. 232, 5 L.Ed.2d 193; Taylor v. Monongahela Ry. Co., 155 F.Supp. 601 (W. D.Pa.), aff'd per curiam 256 F.2d 751 (C.A.3, 1958).

The record discloses that after the injury Thompson did not devote as many hours as he would have liked to longshoreman work because his right foot bothered him. As he continued to work on the waterfront, the pain in his foot would develop from use sooner than before. He therefore worked less frequently at that type of work. However, the gradual increase of pain forced him to relinquish that way of earning a living entirely in 1955, 1956 and most of 1957. Since he was unable to maintain a regular working schedule as a longshoreman, he was forced to rely upon hardwood floor work, which entailed the laying of the lumber, nailing, sanding and finishing, to earn a living. His drop in earnings at this occupation was because his injured foot prevented him from producing as much as the next man.

4. The year in which Thompson was injured, the date being February 27, 1953.

5. In this year, December 28, Thompson received the second injury as a result of which his left leg was amputated below the knee.

6. On October 25, 1962, Thompson was awarded a verdict of $118,000 against the Calmar Steamship Corporation for damages sustained from the injury to his left leg. See Thompson v. Calmar S.S. Corp., 216 F.Supp. 234 (E.D.Pa.), aff'd 331 F. 2d 657 (C.A.3, 1964), cert. denied 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (November 16, 1964). The jury was not told of the verdict received by Thompson.

7. The four day trial in which Thompson was awarded $22,500 began on May 2, and ended May 7, 1963.

The reason why he was able to return to longshoreman work, earn more in the year of injury than the year before and then required to taper off, was explained by his physician. Though his broken foot bones healed solidly, the fractures had involved the base, forming parts of joints, of the second and fourth metatarsal bones. The healing process left the articular area of the base of those two bones in a roughened state. Continual motion of the irregular surfaces from strenuous use of the foot, produced a similar condition on the opposite surface of the companion cuneiform bones. This grating action in turn brought on a gradual thickening (or arthritic changes) of the joint surfaces. The only known remedy for this abnormality is decreased use or complete immobilization of the foot.

Thompson testified that in 1957 a longshoreman could earn as high as $7,000 annually. The amounts which a longshoreman could have earned annually in the years between 1952 and 1957 do not appear in the record. However, those amounts could be ascertained approximately from the hourly rates, which do appear in the record, for those years during which the demand for longshoremen remained relatively constant. But the jury need not have depended on those rates to reach the amount of their verdict. They could have relied upon the wages earned by him during the calendar year 1952, the one prior to the year of injury, as the base amount he probably would have earned in any of the years between 1952 and 1961, and thereafter the amount earned in 1961, as the base amount he probably would have earned in any one year if his right foot had not been injured. These amounts were well within the bounds of reasonableness. Thus in 1952, as Chart No. 1 shows, he earned $1,482 as a longshoreman, and $3,266 as a hardwood floor worker for a total of $4,748, and in 1961 he earned a total of $701 solely from hardwood floor work. Accordingly, Thompson's loss of wages, not counting the seven weeks he was convalescing due to the injury to his right foot, from the time he returned to work on April 20, 1953, to the time of trial in May of 1963, would be $9,630, as shown by the chart below:

| Year | Longshoreman Wages: (Difference between $1,482 and amount earned less than $1,482) | Hardwood Floor Wages: (Difference between $3,266 and amount earned less than $3,266) | Total Annual Loss |
|---|---|---|---|
| 1953 | — | $ 932 | $ 932 |
| 1954 | $ 518 | 546 | 1,064 |
| 1955 | 1,482 | 580 | 2,062 |
| 1956 | 1,482 | — | 1,482 |
| 1957 | 1,276 | 1,924 | 3,200 |
| 1958 | — | — | — |
| 1959 | — | — | — |
| 1960 | — | (Difference between $701 | — |
| 1961 | — | and amount earned) | — |
| 1962 | — | 656 | 656 |
| 1963 | — | 234 | 234 |
| Total | $4,758 | $4,872 | $9,630 |

(Chart No. 2)

The amputation of his left leg prevented him from being gainfully employed either as a hardwood floor worker or as a longshoreman during the years 1958, 1959 and 1960, and thereafter from being employed as a longshoreman. He earned $701 nailing hardwood floors in 1961. This is evidence that he could earn at least that much in a year's time despite the amputation.

During 1953 he earned $3,874 over a 45-week period. His average weekly wage for those weeks was $86. Hence during his seven-week convalescence period he could have earned $602 had he not been injured. Therefore the jury could have found that his loss in wages from February 27, 1953 to the date of trial in May of 1963, was $9,630 plus $602 or a total of $10,232. This sum plus $100.50 medical expense, or $10,332.50, when subtracted from $22,500.00, the amount of the verdict, leaves $12,167.50. The jury could have concluded that this amount was sufficient to compensate Thompson for pain and suffering—past and future, and loss of earning power resulting from the injury to his right foot. This amount is $2,172.00 less than the sum which the trial court believed was a reasonable amount to compensate Thompson for those items of damages, for if we take the $15,000.00 awarded by the Court and subtract $660.50 covering what it determined as loss of wages and medical bills, there remained $14,339.50 attributable to pain and suffering and future loss of wages. Thus it is evident had the jury considered the loss of wages which we have here evaluated, there would be $2,-172.00 less which they might have awarded for pain and suffering and future loss of wages than the $14,339.50 which the Court attributed to pain and suffering and future loss of wages when it decreed $15,000.00 as a reasonable verdict. Accordingly, this amount can surely not be said to be excessive.

## II.

■ In support of its contention that the trial court's denial of its motion for a new trial in the third-party action should be reversed, the shipowner argues that the court committed error in charging the jury as to the basis of its right to indemnity, and should have included in the charge its suggested points for charge Nos. 4 and 6. At the outset the stevedore claims that the shipowner waived its right to raise any alleged errors in the charge because it did not comply with Rule 51 of the Federal Rules of Civil Procedure, which requires a party to state distinctly the matter to which it objects and the grounds of its objection. With the exception of the shipowner's questioning the court's refusal to read verbatim points for charge Nos. 4 and 6, we agree with the stevedore's claim. For reasons which will be stated, we are of the opinion that the court's refusal to read points for charge Nos. 4 and 6 to the jury was proper.

■■ No written contract was introduced into evidence in the third-party action. But the absence of a written contract or the fact that a written cargo handling agreement is silent on the subject of warranties and standard of performance is not a bar to indemnity based on the stevedore's implied warranty to perform in a workmanlike manner, for the shipowner's claim of an alleged breach of a contractual relationship existing between it and the stevedore to unload the ship is a sufficient foundation for the action or suit. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 132, 134, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The implied warranty extends not only to stowage and handling of cargo but also to the use of equipment incidental thereto, Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, including defective equipment supplied by a shipowner, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413 (1959), or by a stevedore. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).

■ Where a stevedore's breach of its implied warranty to unload the vessel in a workmanlike manner leads to a foresee-

able liability of a shipowner, the latter is entitled to indemnity absent conduct on its part sufficient to preclude recovery. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., supra, 355 U.S. at 567, 78 S.Ct. 438. However, negligence on its part will not necessarily affect or defeat the shipowner's claim. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc., supra, 376 U.S. at 321, 84 S.Ct. 748. The warranty may be breached when the stevedore's unworkmanlike activity does no more than call into play the vessel's unseaworthiness. Crumady v. The J. H. Fisser, supra, 358 U.S. at 429, 79 S.Ct. 445. The unworkmanlike activity need not be negligent activity. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., supra.

The uncontradicted testimony supports the following summary of the facts: [8] When the S. S. Duke of Athens, a vessel sailing under the flag of the United Kingdom, arrived in the port of Philadelphia, the 'tween deck of the No. 3 hold was about four feet less than half full of bales of wool. The bales, weighing approximately 400 pounds each, were stowed in the forward half of the hold to a height just under the hatch beams. The cargo in the aft portion of the hold had been removed before the ship arrived in Philadelphia. Five hundred to a thousand pieces of dunnage which had been used to support the removed cargo were strewn over the floor of the 'tween deck where the cargo had been stowed and some of the pieces were piled up against the bales. When the employees of the stevedore boarded the ship on the morning of February 27, 1953, they removed half of the boards from the hatch measuring about 25 feet square. The longshoremen then descended into the hold and pushed or swept the dunnage lying under the square of the hatch away from the bales for a distance of about four feet. This was done so that there would be a clear area on which to tumble the bales and from where they could be lifted out six at a time by means of a sling. At various intervals as the longshoremen removed the bales, they gathered the dunnage that had been between the tiers and placed it out of the way in the aft portion of the hold. When the bales under the square of the hatch had been removed by the sling method, the longshoremen resorted to bale hooks to remove those stowed in the wings and alleyways of the hold. The hooks came in a cluster of twelve on a steel ring attached to the runner. After the longshoremen placed the hooks under two of the steel bands wrapped around each bale, the bales were pulled from their place in the stow, dragged to the area under the hatch, and then lifted out of the hold, all by the power of the winch. Occasionally during this type of operation, one or more of the bales being removed becomes unhooked, bounces and rolls in an unpredicted direction. For this reason the signal to the winch operator to start the bales on their way up is not given until the longshoremen are clear of the path in which the bales will travel.

Just before a draft of bales snugly stowed in the alleyway of the portside wing was to be withdrawn, Thompson and two other longshoremen working on that side of the ship went aft of halfways of the hold and stood in the area where the dunnage from the previous unloading was scattered. The start signal was given to the winch operator, and as the draft was being drawn out, a piece of dunnage under one of the bales flew out and struck another piece on the floor near where Thompson was standing and caused that piece to swing up and strike him over his right foot. The blow fractured the second to fourth metatarsal bones.

Neither the shipowner nor the stevedore is now contesting the jury's verdict that the shipowner is liable to Thompson for unseaworthiness of the ship. It is therefore established as a fact now that there was loose dunnage scattered in the No. 3 hold, that that situation made the hold an unsafe place for Thompson to

8. At the trial, neither the shipowner nor the stevedore produced witnesses to contradict Thompson's fact witnesses.

work, and that the dunnage on the floor was a proximate contributing cause of his injury. The question whether the shipowner was entitled to indemnity was a jury question. The shipowner concedes this much by omitting to file a post-trial motion for judgment n. o. v. in the third-party action. If the stevedore was factually responsible for placing on the floor the pieces of dunnage which struck Thompson, it breached its contract and would be liable to the shipowner for indemnity. However, even though the stevedore was not so responsible, it still could be held liable for indemnity, since its activity brought the unseaworthy condition into play, if that activity were unworkmanlike service in violation of the contract to unload the ship.

Concerning the indemnity or third-party action, the court's charge, in pertinent part, contains the following points:

"Accordingly, if you find that the shipowner performed its obligation under the contract, and if you further find that the stevedore company did not perform its obligation under the contract to discharge the cargo from the ship in a workmanlike manner and with reasonable safety to persons and property, and that such breach on the part of the stevedoring company caused any injuries the plaintiff sustained as a proximate result of the accident, then the shipowner is entitled to recover from the stevedoring company on the third-party complaint as damages for breach of contract any amount the shipowner may be required to pay the plaintiff in this case.

"Finally, members of the jury, based on all of the evidence you will also consider this point of law * * In determining whether there is any liability for indemnity in favor of the ship against the stevedoring company, you may consider whether or not the stevedoring company through its employees *continued to work* there under hazardous conditions and whether they themselves, *notwithstanding any fault on the part of the shipowner*, permitted the work to be done in such a manner that it resulted in injuries to the plaintiff.

"In other words, did they *continue to work* in a place and under such circumstances, knowing it to be hazardous, and did these facts constitute a breach of their contract in which they warranted to do the work in a safe and workmanlike manner? If you find that they breached their contract and that the shipowner is entitled to indemnity, in which case on the second action you would find in favor of the shipowner and against the stevedoring company." (Italics ours.)

This quoted portion of the charge was almost tantamount to a direction for the jury to find in favor of the shipowner. Moreover, nowhere in its charge did the court expressly tell the jury that they could find for the stevedore in the event that they should determine that the stevedore did not breach its contract or that the shipowner failed to meet its burden of proof. Counsel for the stevedore objected to the charge, saying it was his understanding of the law that even if the jury should find that there was a substandard performance by the stevedore, it is still within their province to determine whether the shipowner was guilty of such conduct as would preclude indemnity. The court refused to charge in accordance with counsel's understanding of the law. Nevertheless, the jury found in the stevedore's favor.

■■ Getting back to the objection regarding the court's refusal to read verbatim to the jury the shipowner's proposed points for charge Nos. 4 and 6,[9]

---

9. The refusal of the trial court to read verbatim the precise language suggested by counsel is not error, even if that language is correct. As stated in Ayers v. Watson, 137 U.S. 584, 601, 11 S.Ct. 201, 207, 34 L.Ed. 803 (1891): "A judge is not bound to adopt the categorical language which counsel chooses to put in his mouth. * * * If the case is fairly put to the jury, it is all that can reasonably

point No. 4 in substance would have informed the jury, inter alia, that if they concluded from the evidence that Thompson's "accident" was caused by an unsafe working place "which was created" by the stevedore through a substandard performance or non-performance, then they could find for the shipowner.[10]

However, neither the shipowner nor the stevedore produced any witnesses or documentary evidence to contradict the testimony of Thompson and his witnesses that excess dunnage was strewn in the hold when the ship arrived here. Moreover, the shipowner, in its brief, makes this concession: "There was no dispute as to the facts of the case, i. e., that dunnage was in the vessel prior to discharging [at Philadelphia], that it was strewn about and created an unsafe condition, all of which was known to the stevedore." [11]

Obviously Thompson would not have been injured had he retreated from the spot where he was standing when struck. While the wording of point No. 4 covers this question, and though the charge did not specifically mention it, that question was an ingredient of the court's charge. Had the shipowner desired the charge to be more specific on this question, it should have made known its wish to the court. Cf. Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd., 369 U.S. 355, 363–364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). Additionally, one of Thompson's witnesses testified, without contradiction, that the further one went aft in the hold the greater was the danger of being spiked by nails protruding from pieces of loose dunnage.

Point No. 6, in short, would have informed the jury that if they found that Thompson sustained injuries by reason of the unseaworthy condition of the vessel, and if the stevedore "did not correct the condition and continued to work under such conditions", then they could award indemnity.[12] The intended purpose of this proposed point was to advise the jury that it was the obligation of the stevedore to refuse to work in the No. 3 hold if it failed to remedy the obviously known hazardous condition there. The above quoted portion of the trial court's charge conveyed that message to the jury.

The testimony of one of Thompson's witnesses revealed that on a foreign ship the custom was for members of the crew to clear away the loose dunnage after the cargo had been discharged.[13] We agree with the shipowner that the failure of the crew to have cleared the No. 3 hold of excess dunnage or put it out of the way of employees of the stevedore would not, per se, prevent the shipowner from recovering indemnity. Despite the ship's duty owed Thompson, to clear away the excess dunnage, the stevedore could have performed that chore before it began discharging the bales. Ordinarily, for its failure to do so, a jury could find that it breached its warranty to unload in a

be asked." Also see Alexander v. Kramer Bros. Freight Lines, Inc., 273 F.2d 373, 375 (C.A.3, 1959).

10. Point for Charge No. 4 reads as follows: "4. If you conclude from the evidence that the plaintiff's accident was caused by an unsafe working place, which was created or brought into play by the stevedore, through the negligence of its employees in performing the work, or in the failure to do that work in a safe and proper manner, or in the failure to exercise supervision or control of the work, the shipowner is entitled to recover from the stevedore all damages which you have awarded in the original action."

11. See Brief of Appellant (No. 14,913), p. 13.

12. Point for Charge No. 6 reads as follows: "6. If you find that plaintiff sustained injuries by reason of unseaworthy condition of the vessel, or the existence of an unsafe place to work, and if you find that B. H. Sobelman & Co. Inc., through its employees, had knowledge of the presence of this unseaworthy condition from approximately 8:00 o'clock in the morning until the happening of the accident and did not correct the condition and continued to work under such conditions, then the shipowner is entitled to recover from the stevedore of damages which you have awarded in the original action."

13. The practice regarding American vessels is for the shipowner to hire "shipcleaners" to do that work.

workmanlike manner. Mortensen v. A/S Glitter, 348 F.2d 383 (C.A.2, 1965). In our case, one of the longshoremen, Bernard Troutman, who was in the No. 3 hold on the day Thompson was injured, testified, without being contradicted, that when the condition of the hold was called to the mate's attention, his response was: "Just leave it lay there. That is all right." It has been recognized that indemnity may be denied when the shipowner or those operating the vessel participate in some way in the decision to work in an unseaworthy area of the ship or induces the stevedore to go on with the work. Hagans v. Farrell Lines, Inc., 237 F.2d 477 (C.A.3, 1956); Hodgson v. Lloyd Brasileiro Patrimonio Nacional, 294 F.2d 32 (C.A.3, 1961); United States v. Harrison, 245 F.2d 911 (C.A.9, 1957). While the Court did not state to the jury that if they believed that the mate told the longshoremen to leave the dunnage where it was, that body was at liberty to find either that the stevedore was released of any obligation toward the shipowner to clear it out of the way, or that the mate's response constituted conduct on the part of the shipowner sufficient to preclude recovery of indemnity as the shipowner complains, nevertheless its failure to so advise the jury could, in no wise, harm the shipowner as it was unfavorable to the stevedore. Moreover, since one of the factual questions in the case was whether there was a duty upon the stevedore to have removed the excess dunnage (i. e., corrected the unseaworthy condition), Point No. 6 begs this question by assuming that there was such a duty, and hence amounted to a request for a directed verdict on an additional ground.

It is submitted the trial court's refusal to read Points 4 and 6 to the jury gave no cause for complaint to the shipowner by way of reversible error.

Accordingly, at our No. 14,943, both the judgment entered March 19, 1964, on the $10,000 verdict, and the order of October 4, 1963, as amended, allowing a new trial in the original action if Thompson fails to remit all damages above the sum of $15,000 within ten days of service of the order will be reversed with instructions to reinstate the judgment of May 7, 1963, entered on the verdict of $22,500; and, at No. 14,913, the order of October 4, 1963, denying the motion of Trent Maritime Company, Ltd., for a new trial in the third-party action will be affirmed.