Ramon SANCHEZ, Plaintiff,

v.

LUBECK LINIE A.G., Defendant and
Third-Party Plaintiff,

v.

MAHER STEVEDORING COMPANY,
Inc., Third-Party Defendant.

No. 69 Civ. 1754.

United States District Court,
S. D. New York.

Nov. 5, 1970.

———◆———

DiCostanzo, Klonsky & Cutrona, Brooklyn, N. Y., for plaintiff, by Philip F. DiCostanzo, Brooklyn, N. Y., of counsel.

Cichanowicz & Callan, New York City, for defendant and third-party plaintiff, by Victor S. Cichanowicz, New York City, of counsel.

Alexander, Ash, Schwartz & Cohen, New York City, for third-party defendant, by Joseph Arthur Cohen, New York City, of counsel.

## OPINION AND DECISION

POLLACK, District Judge.

The plaintiff, an experienced longshoreman, was injured on December 22, 1966 during the loading of the M. V. LUBECK while it was moored at a berth in Port Newark, Newark, New Jersey. He was lawfully aboard as an employee of Maher Stevedoring Company, Inc., the third party defendant. The latter was engaged in cargo operations aboard the vessel pursuant to a stevedoring contract between the defendant shipowner and Maher. The lower hold of hatch No. 1 had just been loaded and the gang of longshoremen were in the process of covering the hatch opening with a pontoon, which is a heavy sheet of steel about ¾″ thick and about 23′ long and 5′ wide. Each hatch was 25 to 30 feet long.

Hatch No. 1 contains five lower holds. The lower holds have hatch openings for which pontoons were used as covers. The longshoremen came aboard on the morning of the accident to load the lowermost hold; they found that the pontoons at the forward end of the four hatch openings were in position. Having completed loading of the lower-most hold, it became necessary to cover the hatch opening at the fourth level where one pontoon was already in place at the forward end.

The pontoon covers were stored on the upper deck and had to be passed through narrow openings to place them below. The winchman had to angle or tilt each sheet alternately from side to side to slide it through the openings. He did this by resting the pontoon on one side of the hatch opening and lowering the free side so that the pontoon was tilted and slid through into the next lower hatch opening. The process was repeated at each level.

Two pontoons had been lowered that morning to the lowest level, so as to place a total of three in position. The next pontoon caused the mishap. It was lowered, employing the same method, but it struck the hatch coaming at the floor of the third level and was precipitated out of control into the fourth level of hatch No. 1 and came directly at the plaintiff who was working there. He put out his left hand to ward off the descending pontoon to avoid being hit on the body. The heavy pontoon carried his hand up against a part of the vessel, pinning and crushing it with resultant painful and crippling injuries to his left hand and fingers.

The plaintiff charges that the proximate cause of this accident was the shipowner's failure to have controlling tag lines attached to the bridle used in lowering the pontoon and its consequent in-

ability to guard against such an occurrence. The tag lines are ropes which hang down from the pontoon bridle. By manipulating them, the men can control the course of the heavy steel sheet, and direct it away from their bodies, during its downward progress to the hold in which the sheet must be placed. The plaintiff further charges that the defendant shipowner was negligent in permitting the use of a dangerous, unsafe and hazardous method of positioning the pontoons and in failing to stop the work until appropriate tag, or guide, lines were attached to control the heavy steel sheet being thus lowered, by alternately slanting its sides until it reached the desired position.

Section 1504.42 of the Health and Safety Regulations for Longshoring instructs that pontoon bridles "shall not be used" unless:

(d) at least two legs of all strongback and pontoon bridles shall be equipped with a substantial fibre rope lanyard at least eight feet long and in good condition. The bridle end of the lanyard may be of chain or wire. 33 U.S.C. 941, 29 C.F.R. Part 1504, Eff. June 20, 1966.

There is no doubt and the Court finds that the performance of the cargo operation was with inadequate equipment and by the use of a dangerous, unsafe method which created a hazard for the plaintiff and an unsafe situation in which to perform his work. The M. V. LUBECK was unseaworthy. Its unseaworthy condition proximately caused plaintiff's injuries. The plaintiff was not contributorily negligent and in no way caused his own injuries.

Prior to the instant accident, the plaintiff had sustained injuries, some nine years earlier, in a factory, when a record making machine had amputated the middle three fingers of his *right* hand. He also injured his little finger and as a result had a permanent stiffness of the little finger.

The accident on the M. V. LUBECK resulted in a compound transverse fracture of plaintiff's left thumb, the proximal phalanx (bone of the finger), with almost complete amputation. He developed a non-union which required a bone graft operation for the fracture of the proximal phalanx, but the bone graft incompletely canalized. He is unable to eat with his left hand and cannot tie his shoe laces because of the permanently partially flexed position of the interphalangeal joint. He suffers and will suffer numbness of the thumb, adhesions of the extensor and flexor apparatus which causes the interphalangeal joint to be in fixed partial flexion. He has lost 50 percent of the use of his left thumb which represents about 25 percent of the left hand; in terms of the entire upper extremity this represents approximately 17½ percent of the arm. His injuries and various pain and suffering therefrom are permanent.

The plaintiff was hospitalized from December 22 to December 24, 1966 and again from May 23 to May 31, 1967 and was totally disabled between the date of the accident, on December 22, 1966, and October 27, 1967. During this disability and intermittent lost time thereafter, his lost wages amounted approximately to $10,500. Plaintiff, at the time of the accident, was 44 years of age with a work expectancy of 24 years and a life expectancy of 27.7 years. He returned to work on October 27, 1967 with intermittent loss of time thereafter. However, the accident has left the plaintiff permanently crippled and impaired for heavy work.

The plaintiff's damages, including all recoverable elements to the date hereof, involve, among other things, impairment and permanent injury resulting solely from the accident aboard the M. V. LUBECK, pain and suffering, and loss of wages. Plaintiff's damages are of the

value of $30,000., which sum plaintiff is entitled to recover from the defendant shipowner.

The shipowner seeks indemnification from the stevedore alleging that the stevedore breached its warranty of workmanlike service and brought the unseaworthy condition of the ship into play.

There is no dispute that the shipowner provided the bridles for the purpose of placing the pontoons in the No. 1 hatch. Nor is it disputed that at the time of the accident, the pontoon bridle was not equipped with tag lines. What is in dispute is whether the ship had tag lines, and whether anyone representing the shipowner ordered the stevedore to lower the pontoon without the tag lines.

The winchman, who testified through a Spanish interpreter, said, "We had finished the loading of the hold below and we were going to close up. And I asked for the hooks. The hooks were brought to me. They had no tag lines on them." It is at this point that the evidence is in conflict. The winchman testified that two officers of the German ship, whose native tongue presumably was German, were told (allegedly in English) to put tag lines on the hooks but that they made believe they didn't understand the winchman. The latter testified that he was told that they did not have any tag lines and that they directed the winchman to continue to work without them. The winchman admitted that he actually did not ask for tag lines as such, but requested the ship's officers to "give me ropes for securing the pontoons".

The Chief Officer on the ship, a German who testified in English, testified that no one asked for tag lines or rope. He also testified that there was nothing special about a tag line, which was simply a length of rope, and that rope was always plentiful aboard ship. He said that whenever the ship was loading or unloading, the Bosun was under orders to make available any equipment the longshoremen needed, including rope. The Bosun was not produced at the trial. He is located in Berlin, Germany, working ashore.

The testimony of the winchman is not credible. Although the Court is troubled about the Spanish-speaking winchman's ability to make his complaints known to the ship's officers and to understand their reply, if indeed there was a complaint and a reply, the Court is more concerned about the inconsistencies in the winchman's testimony. Immediately after testifying, "The hooks were brought to me. They had no tag lines on them. There were two officers and I told them to put tag lines on them. They made believe they didn't understand me." the winchman stated, "And they told me that they did not have any tag lines and that I was to continue work that way." This Court is at a loss to understand how ship's officers can both not understand (or pretend not to) and give instructions relating to the not-understood question.

The credible testimony is that rope was available. Nothing indicates that the ship had any reason for refusing the rope's availability and no credible testimony indicates that it did so.

■ The Court finds that the stevedore knew that the pontoon bridles lacked tag lines and that it did *not* act reasonably in going forward with an operation which involved the use of inadequate and unsafe equipment. The Court finds that the stevedore breached its warranty of workmanlike service. In the landmark decision in this area, Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court wrote:

> The shipowner here holds [the stevedore's] uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily

includes [the stevedore's] obligation [to perform] properly and safely. Competency and safety * * * are inescapable elements of the service undertaken. This obligation * * * is of the essence of [the] stevedoring contract. It is [the stevedore's] warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. 350 U.S. at 133–134, 76 S.Ct. at 237.

The Second Circuit opinion which *Ryan Stevedoring* affirmed, Palazzolo v. Pan-Atlantic S. S. Corp., 211 F.2d 277 (2d Cir. 1954), had held that indemnity over is recoverable where, as was the case in *Palazzolo*, "the employer's negligence was the 'sole', 'active' or 'primary' cause of the accident." 211 F.2d at 279. The Supreme Court did not employ the active-passive distinction, and subsequent decisions indicate that its action was purposeful. In Weyerhaeuser S. S. Co. v. Nacirema Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), the Court wrote, "[I]n the area of contractual indemnity an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate," 355 U.S. at 569, 78 S.Ct. at 442.

In *Weyerhaeuser*, the Supreme Court also noted that a shipowner's right to indemnification when a stevedore has acted unreasonably, is not absolute. It held that the shipowner was "entitled to indemnity absent conduct on its part sufficient to preclude recovery," 355 U.S. at 567, 78 S.Ct. at 441. The Supreme Court has never specified what conduct by the shipowner would preclude recovery.

The stevedore cites lower court cases which it claims hold that an order issued by the ship's officers to the stevedore to continue working with defective equipment or in an unsafe area is conduct which precludes recovery. This Court has already found that no such order was issued in this case. Even had the instruction which the winchman testified to been given, it would not be sufficient to preclude recovery in the circumstances of this case.

In two of the cases cited by the third-party defendant, Hudson S. S. Co., Ltd. v. Colon, 314 F.2d 44 (1st Cir. 1963) and Hodgson v. Lloyd Brasileiro Patrimonio Nacional, 294 F.2d 32 (3d Cir. 1961), the ship was aware of defects in equipment. However, its officers did not order the longshoremen to work with that defective equipment. Rather, the ship's officers attempted to repair the equipment. The injuries complained of grew out of use of still-defective equipment which was represented by the ship as having been repaired. In *Hudson S. S.*, the First Circuit wrote in a *per curiam* opinion:

> [O]n at least three occasions prior to the accident [the stevedore], finding the winch defective, had called [the shipowner's] attention to the fact. The court found that on each occasion [the shipowner] did some work on the winch, told [the stevedore] that it was sufficiently repaired, and instructed him to resume. Shortly after the last repair the accident occurred. * * *

> [W]e doubt if the evidence would * * * have permitted a finding that the defect again manifested itself until the accident. 314 F.2d at 45.

In *Hodgson*, the Court noted that the accident occurred "after the very first or second attempt to raise a load" following a longshoreman's complaint about one of the ship's winches and the appearance of a crew member who worked on the machine and then said, "O.K., go ahead." The Court found that the shipowner had "assure[d] the stevedoring company that the known defects had been repaired." 294 F.2d at 35.

The officers of a ship issued an order to work despite the presence of oil underfoot and indemnity was denied in United

States v. Harrison, 245 F.2d 911 (9th Cir. 1957). However, the Court noted that the United States was the shipowner and said:

> [C]ontinuance of work was induced by agents of the government where it is probable no attention by the gangs would have been paid to wheedling or pressure of officers of a vessel in private employment. A stoppage of work on a government contract has implications of unpatriotic action. Since these agents used this argument impliedly, they should not be relieved of the consequences of the unseaworthiness * * * 245 F.2d at 916–917.

Compania Anonima Venezolano de Navegacion v. Matthews, 371 F.2d 971 (5th Cir. 1967), also cited by the third-party defendant, is a case in which indemnity was denied because the mate in charge of stowing cargo not only "insisted" that the longshoremen work in a hold partially filled with dunnage but also ordered the longshoremen to stack the dunnage in a manner which contributed to the accident.

Thompson v. Trent Maritime Co., 353 F.2d 632 (7th Cir. 1965), denied indemnity when a ship's mate, told of the presence of potentially dangerous dunnage in the hold, said "Just leave it lay there. That is all right." However, that case has not been followed in this Circuit. In Albanese v. N. V. Nederl. Amerik Stoomv. Maats, 279 F.Supp. 635 (S.D. N.Y.1967), a District Court relied on *Thompson* when it denied judgment n. o. v. after a jury had brought in a verdict for the stevedore on the question of indemnity.

The Second Circuit reversed, writing:

> The court denied the * * * motion post trial for judgment n. o. v. in part because of the continuance of work in pursuance of the orders of the mate, quoting Judge Ganey in Thompson v. Trent Maritime Co. * * * We think

that this misconstrued the decision of this court on the first appeal of this case. We there * * * held that merely concurrent fault is not enough, * * * [W]e held erroneous an instruction that the request to the ship's officer was sufficient to absolve the stevedore, and pointed out that there was no evidence of active "hindrance" by the ship. 392 F.2d 763, 765 (2d Cir. 1968).

The Supreme Court reversed the Second Circuit opinion, *sub nom,* International Terminal Operating Co. v. N. V. Nederl. Amerik Stoomv. Maats, 393 U.S. 74, 89 S.Ct. 53, 21 L.Ed.2d 58 (1968). In so doing, the Court did not choose to specify what conduct by a shipowner would preclude indemnity. It simply held that the Court of Appeals had usurped the jury's function. The opinion in the Circuit Court therefore remains this Circuit's statement on what action by the shipowner will defeat its claim for indemnification. In the case before this Court, the shipowner's direction did not hinder performance by the stevedore. The stevedore's unreasonable decision to go forward with the pontoon lowering operation caused the injury to the longshoreman. This is a proper case for indemnification.

The stevedore also claims that Clause 18 of the stevedoring contract prevents recovery against it. Clause 18 says:

> 18. It is expressly understood that in the event any vessel fails to comply with provision of Public Law 85–742 [which is the Public Law pursuant to which the Safety and Health Regulations for Longshoring, including the requirement that pontoon bridles be equipped with tag lines, were promulgated] * * * all charges and penalties arising out of such failure to comply shall be for the account of Vessel Owners or Charterers except where such charges and penalties are incurred through the negligence of the Contractor.

As was noted when the Court was presented with a contract clause similar to that just quoted:

> This clause fails to meet the test which the courts have demanded: a clear and explicit agreement by the parties to eliminate an implied warranty that the stevedore will do his job in a workmanlike manner. Caputo v. Kheel, 291 F.Supp. 804, 809 (S.D.N.Y.1968).

In addition, this Court finds that the stevedore's action in going ahead with the lowering of the pontoons without using tag lines was so unreasonable as to constitute negligence.

The shipowner shall be indemnified not only for the damages recovered by the plaintiff, but also for defense costs including counsel fees and reasonable disbursements. DeGioia v. United States Lines, 304 F.2d 421, 426 (2d Cir. 1962); Misurella v. Isthmian Lines, Inc., 215 F. Supp. 857, 863 (S.D.N.Y.1963).

The third-party defendant's counterclaim, seeking indemnification from the third party plaintiff for any sums which it is required to pay as a result of the third party action on the ground that its liability results from negligence and breach of contract, is dismissed. The above discussion indicates that even if tag lines were unavailable at the time of the accident, a contention which this Court does not accept, the injury to the longshoreman resulted from the stevedore's breach of the warranty of workmanlike service.

The plaintiff is entitled to recover from the defendant the sum of $30,000 together with costs; and the defendant is entitled to indemnity from and a recovery over against the third party defendant in the amount of said recovery together with costs and counsel fees. The latter will be fixed in the judgment to be entered hereon on application therefor submitted with the judgment to be entered, unless the parties can agree on the amount thereof.

The above shall constitute the findings of fact and conclusions of law under Rule 52(a).

Submit judgment on notice within 10 days.

So ordered.